CASE 34—INDICTMENT—OCTOBER 2.

# Smith vs. Commonwealth.

APPEAL FROM JEFFERSON CIRCUIT COURT.

1. The statement in a bill of exceptions, that the defendant moved " the following instructions," and that the Commonwealth moved " the following," and that then " the court gave to the jury the following instructions *in lieu* of those refused and in explanation of those given," held sufficient to show that the record exhibited all that were given or refused. '(*Crim. Code, sec.* 305 ; 3 *Met.*, 10, 18.)

2. An instruction that " if homicide be committed by a deadly weapon in the previous possession of the slayer, the law implies malice in the perpetrator," given without qualification, is misleading.

3. One who, designing a homicide, drinks to intoxication, and in that condition commits it, is guilty of murder ; but drunkenness brought on by sensual or social gratification, with no criminal intent, may reduce an unprovoked homicide from murder to manslaughter ; and if transient insanity ensue, although it should not altogether excuse, it should mitigate the crime.

4. An instruction that " where the jury, from the evidence, entertain a rational doubt on the question of *insanity*, they should *always* find in favor of sanity," held erroneous.

5. The rational doubt which should acquit, is a doubt as to all or any of the constituent elements essential to guilt. A doubt of *sanity* should always avail—a doubt of *insanity* should not. (16 *B. M.*, 591.)

6. Moral insanity is now as well understood and established as intellectual insanity. "The true test of responsibility is, whether the accused had sufficient reason to know right from wrong, and whether or not he had sufficient power of control to govern his actions."

G. A. & I. CALDWELL, for appellant, cited *Whart. Am. Cr. L.*, sec. 930; *Wharton's Med. Juris.*, pp. 46, 47, 43, 45, 146–7–8, 151, 152.

W. F. BULLOCK on same side.

H. POPE, on same side, cited 1 *Hawk. P. C.*, 97.

JOHN M. HARLAN, Attorney General, for Commonwealth.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

Robert Smith, convicted by the verdict of a jury, and sentenced by the circuit court to be hung, on an indictment charging him with the murder of Frederick Landaur, appeals to this court for a reversal, on the ground that the indictment is insufficient, and that the circuit judge erred in giving and in withholding instructions on the trial.

Considering the indictment substantially and clearly good, we will confine our revision to questions involved in the instructions. But we must first notice, *in limine*, an objection to the jurisdiction of this court urged on the authority of the cases of *Clem vs. the Commonwealth* (3 *Met.*, 10), and *Jane vs. the same* (*Ib.*, 18), expounding section 335 of the Criminal Code, which enacts that " a judgment shall not be reversed for an error in instructing or refusing to instruct the jury, unless the bill of exceptions contain all the instructions given by the court to the jury, and unless it shall, thereupon, appear that the law applicable to the case was not correctly and fairly given to the jury." Shall the appellant prove by the record that the bill of exceptions contains all the instructions, or shall the Commonwealth show that it does not? The Code nowhere answers this question. And it is our opinion, that unless the record, in some way, authorizes the inference that it does not contain all the instructions, or a doubt whether it does or not, the judicial presumption may reasonably be that it does. But, however this may be, we are satisfied that, in this case, the statement in the record that the defendant moved " the following instructions," and that the Commonwealth moved " the

following," and that then "the court also gave to the jury the following instructions *in lieu of those refused and in explanation of those given*," should, even according to the two cases in Metcalfe, be deemed sufficient to show that the record exhibits all that were given or refused. If this be not enough, then nothing would do, but an express statement in the record that it contains all the instructions. But the cases referred to concede that no such suggestion is required by a proper interpretation of the Code.

We will therefore consider the instructions. The record contains thirty-six instructions, of which eleven were offered by the Commonwealth, seven by the accused, and eighteen more were given, *sua sponte*, by the court. The jury could not, without great hazard of confusion and error, thread such a labyrinth; and even this court itself, after a careful collation and anxious scrutiny, cannot see what precise law was given to the jury, on the whole of the vital facts and principles involved in the question of murder. Shall a man's life be staked on such a confused, incongruous, and bewildering chaos of instructions? We are not sure that this alone might not be good cause for reversing the judgment, even though those written by the court are clear, and most of them right. But there are other and more specific errors, among which we cannot, without inconvenient and needless elaboration, notice more than the following:

1. By the 5th instruction proposed by the Commonwealth and given to the jury, they were substantially told that, though Landaur " called Smith a damned liar," and the latter, armed with a pistol, which he intended to use, if necessary, in self-defense, challenged the former to a fight, they might find him guilty of murder. On that abstract hypothesis, the provocation, the excited passion, and the suddenness of the resulting homicide, might reduce it to manslaughter. That instruction, therefore, was delusive and erroneous.

2. The court instructed the jury, that "if homicide be committed by a deadly weapon in the previous possession of the slayer, the law implies malice in the perpetrator." As given, without qualification as to how or for what purpose the

weapon happened in the perpetrator's possession, or whether, having it for a lawful purpose, he used it in self-defense, or under sudden and provoked heat of passion, this instruction was certainly wrong and misleading.

3. The court also intructed the jury, that " in cases of homicide, without any provocation, the fact of drunkenness is entitled to no *consideration;*" and that " temporary insanity, which has followed as the immediate result of voluntary drinking to intoxication, is no excuse for crime." In all this we cannot concur. If a man designing a homicide drink to intoxication, either to incite his animal courage or prepare some excuse, the killing will be murder. But if sensual gratification or social hilarity, without any premeditated crime, induced the drinking, surely his condition *may* be such as to reduce even an unprovoked homicide from murder to manslaughter. And, if transient insanity ensue, although it should not altogether excuse, yet it should mitigate the crime of the inevitable act. There was some testimony in this case tending to show that the appellant, when he killed *Landaur*, was intoxicated, and also, that such a condition superinduced moral insanity. And the jury had a right to weigh that testimony and determine, not only the fact of intoxication, but its actual effect on the mind and the will, and consequently on the conduct of the appellant. Had they believed that it was neither simulated nor malicious, but, without even producing momentary insanity, prompted a homicide which otherwise would not have been perpetrated, they had a right to decide that the act was not so criminal as murder; and if, especially, they had been satisfied that the act was the offspring of momentary insanity, they could not, as conscientious triers, have doomed such a victim to the gallows. The instruction tacitly concedes that *permanent* insanity, produced by drunkenness, may excuse a homicide. And this, contrary to the ancient doctrine, is now universally conceded to be American law. And why is it law? Only because no insane man is responsible for insane acts. And why should an insane act, prompted by *transient* insanity, have no exculpatory or mitigating effect on the question of crime or of its grade? In Lord Coke's day a man could not

avoid a contract on a plea of insanity, or of incapacitating drunkenness. That absurdity has been long exploded. And why should its spurious twin—that drunkenness, whatever may be its effect, is no excuse for crime—be still recognized as law in this improved age of a more enlightened and homogeneous jurisprudence? We conclude that this instruction did not clearly and distinctly embody the true modern law, and may have been, therefore, prejudicial to the appellant.

4. The next instruction we shall consider is the following, as given to the jury: "Where the jury, from the evidence, entertain a rational doubt on the question of *insanity*, they should *always* find in favor of sanity." This, too, is not now, either altogether or always, a consistent and true doctrine. Can it be possible that, here and now, a jury is bound to hang a man for murder when they rationally and strongly doubt his capacity to commit any crime?

The "rational doubt" which should result in acquittal, lest an innocent man might be unjustly punished, is a doubt as to all or any one of the constituent elements essential to legal responsibility or punishable guilt; and, unless they all concur, acquittal is the legal consequence. As a sound and responsible mind is indispensable to such guilt, why should not a strong and rational doubt of the capacity to commit the imputed crime favor the acquittal of the accused? It is true that, *prima facie*, every man is presumed to be sane, and, therefore, the burthen of proof to rebut this presumption devolves on party claiming the benefit of the plea of insanity. But so, too, in like manner, every man charged with crime is presumed innocent, and will be so held until the Commonwealth shall rebut that presumption. But if the testimony for rebutting it should leave room for a rational doubt of guilt, "not guilty" is the verdict of the law. Why, if the evidence of insanity is strongly preponderating, should not the presumption of sanity be rebutted, and why should the jury be bound to find sanity merely because insanity has not been proved with such absolute certainty as to exclude a rational doubt? If this be their duty, then, in all cases of partial insanity, a case could scarcely be imagined, and perhaps may never arise, in which a plea

of insanity can be made available. A doubt of sanity is essentially different from a doubt of insanity—the former should always avail, the latter never.

When the proof of insanity is ever so strong, there may, and generally will be, a doubt whether, nevertheless, the accused was not sane; this is a doubt of sanity which should never convict, but should always acquit. "Belief" is of different degrees of certainty and assurance. On such a metaphysical question as that of partial insanity no proof of it can impress the jury with moral certainty. The preponderating probability of insanity may be as assuring as that on which they individually act in the affairs of ordinary life; and, therefore, they may be said to "believe" the alleged insanity, and yet may feel some rational doubt of it. Such a doubt in such belief may compel a rational doubt of responsible sanity. And, so doubting, the jury ought not to convict. But when the evidence strongly preponderates in favor of sanity, a doubt whether, nevertheless, the accused was not insane, should never acquit. And this is what we mean by a doubt of insanity.

The instruction does not. discriminate between the two classes of cases, but confounds them; and it was therefore misleading. And this conclusion is not at all inconsistent with the principle of the case of *Graham vs. the Commonwealth* (16 *B. Mon.*, 591). In that case the instruction adjudged indefensible, assumed the sufficiency of a doubt of insanity, not of sanity, and the decision of the question thus propounded was all that was judicial in the case.

The last instruction we shall notice is in the following words: "To establish a defense on the ground of insanity the accused must prove that, at the time of the killing, he was laboring under such defect of *reason*, from disease of the *mind*, as not to know the nature and quality of the act he was doing, or, if he did know it, he did not know he was doing wrong."

All this may be true in most cases of *intellectual* insanity. This species of insanity, as first defined by Irskine and illustrated by the sustained verdict in Hadfield's case, is "*delusion*" arising from a partial eclipse of the reason, or from a morbid

perversion of the percipient faculties, which present to the abnormal mind, as accredited realities, images of objects that have no actual existence, or a false and distorted aspect of existing objects. Whether the true theory of the human mind be psychological or only physiological, spiritual or material, man is certainly so constituted as to be compelled to believe the testimony of his own senses. This is the ultimate test of all human knowledge, and necessarily has the force and certainty of intuition, which no reasoning can overcome or impair. The intellectual monomaniac may reason logically, but he reasons from false premises which his morbid mind assumes, with intuitive confidence, to be undoubtedly true. His false conclusion, therefore, may result, not from "defect of reason," as assumed in the instruction, but from an insane assumption of false premises. To punish a homicide, committed by the insane victim of such delusion, and under its resistless influence, would be punishing for what every other man in the same condition would ever do, in defiance of all penal consequences; and, therefore, such punishment would be useless and inconsistent with the preventive aim of all criminal jurisprudence.

Although he had an abstract knowledge of "right and wrong," and knew that crime is justly punishable, nevertheless, he did not know that *his* act was criminal, but felt sure that it was lawful and righteous. But if he knew that he was doing wrong, he was not impelled by delusion, and his act was criminal. As the intellectual was the only species of monomania recognized for many years after the trial of Hadfield, the doctrine repeated in this instruction, excepting only the "defect of reason," which it seems to presuppose was established as applicable to all pleas of insanity in criminal cases; and, until lately, it had been applied to a class of cases which are not within the scope of its philosophy.

Moral insanity is now as well understood by medico-jurists, and almost as well established by judicial recognition, as the intellectual form. Mentally, man is a dualism consisting of an intellectual and a moral nature. It is this peculiar nature that exalts him above the animal and makes him, legally and

morally, a responsible being. The animal has neither reason to guide nor a moral will to control its passions. Passion governs and instinct alone guides its conduct. It is, therefore, not responsible to the criminal·law. But a proper man, in a sound and normal state, with a *"mens sana in corpore sano,"* has, peculiarly and pre-eminently, the light of reason to guide him in his pathway of duty, and also has *a free* and *rational presiding will* to enable him, if he so choose, to keep that way in defiance of all passion and temptation. It is this intellectual and moral nature alone that makes him, in the probationary sense, a man, and holds him responsible for his voluntary conduct. And it would be as useless and cruel to hold him accountable, either criminally or morally, for an act done without a free, rational, and concurrent will, as it would be, if his reason had been in total eclipse.

The common law progresses with all other science with which it is affiliated as a growing and consistent whole. And, consequently, as the science of man's moral nature has developed the phenomenon of insane affections, emotions, and passions, which either neutralize or subjugate the will, medical jurisprudence recognizes this morbid and overwhelming influence as moral insanity, and pronounces it as exculpatory as the other form called intellectual insanity. No enlightened jurist now doubts the existence of such a type of moral, contradistinguished from intellectual, insanity as *Homicidal* mania or morbid and uncontrollable appetite for man-killing ; and *Pyromania* or the like passion for house-burning ; and *Kleptomania* or an irresistible inclination to steal. In each of these cases, and others of a kindred character, whether the unnatural passion be congenital or only the offspring of some supervenient cause, moral unhingement, and a subjugated or subsidized will, are the invariable characteristics. This is disease, and the man thus doomed to the anarchy of morbid and ungovernable passions is, in law as well as in fact, insane, and, to the extent of the operation of that blind and brutal influence, he may be no more responsible than a tiger or other brute. But if his insanity extend no further than a morbid perversion and preternatural power of insane passion or emotion, he not only " knows right

from wrong," but knows, also, that the act he is impelled to do is forbidden by both moral and human law. Yet, nevertheless, his will being paralyzed or subordinated, the uncontrollable appetite necessitates an act which he knows to be wrong and justly punishable. But, as he was a helpless puppet in the hands of Briarean passions, he is no more a fit subject of punishment than an animal without a controlling will, or than he, himself, would have been, had he never been blessed with that moral pilot of the passions. The instruction, as given, excluded any such insanity from the jury. The instruction given by the circuit judge in the case of *Graham vs. the Commonwealth* was more comprehensive, and as nearly right as any we have seen on that subject in any case. It was as follows: "The true test of responsibility is, whether the accused had sufficient reason to know right from wrong, *and whether or not he had sufficient power of control to govern his actions.*"

The instruction we have been considering in this case was, therefore, not only inapplicable to the species of insanity relied on by the appellant, but was radically defective in principle.

Deeming futher amplitude unnecessary, and, therefore, unbefitting, we conclude that, for the foregoing errors, the verdict and judgment in this case ought not to stand.

Wherefore, the judgment is reversed, the verdict set aside, and the cause remanded for a new trial.