At a Court of Oyer and Terminer held at this term Isaac C. West was indicted for the murder of Henry C. Turner, alias Couch Turner, of the first degree, and was tried at the adjourned term commenced on the 3d day of June following.
The indictment alleged that it was committed on the 2d day of December 1872, and the evidence produced by the prosecution was that two weeks prior to that time the prisoner rented the second floor, consisting of two rooms, a front and back one, of a house on Loockerman Street in the town of Dover, in which he introduced the necessary apparatus for the manufacture of a peculiar gas by a process of which he was the proprietor, to be administered by inhalation, and which he claimed possessed valuable healing properties in several kinds of diseases; and that when he applied to the owner of the house to rent them, and was informed by him that the house, though then unoccupied, was already rented for the ensuing year to another person to commence on the first *Page 373 
day of January following, he replied that he wanted to do enough in two weeks to make or break him, and on his assurance that he had seen the person referred to and that he would have no objection to his application for the rooms, and that he would do no injury to them, they were rented, to him by the owner for the residue of the year. That the deceased, Couch Turner, was a negro and a common laborer, doing irregular jobs of work about the town when called on for that purpose; and that he was intemperate, but civil, obliging and peaceable in his character and disposition. That the prisoner went to a brother of the deceased and enquired for him about 8 o'clock in the morning of the second day of December 1872, and about 4 o'clock in the afternoon of that day the prisoner and deceased came to a liquor saloon adjoining the house in which the prisoner had his rooms on Loockerman Street, the deceased wheeling a large dry-goods box on a wheelbarrow, and stopped on the side walk in front of it, when the prisoner stepped into the saloon followed by the deceased, and calling the keeper of it aside, asked him to let the deceased have a drink, which he did, when the deceased filled a tumbler nearly full of brandy and drank it, for which the prisoner paid, and that the deceased was full of liquor when he entered the saloon. That soon after they left the saloon, the keeper of it stepped to the front door and looked out into the street and up and down it, but saw neither of them, and for that reason he supposed they had gone to the prisoner's rooms in the next building, as they had not had sufficient time to get out of his sight in any other way; and that so far as could be ascertained the deceased had not been seen alive by any one, except the prisoner, since that time. That on the following day the prisoner said to an acquaintance in conversation with him on the pavement in front of the door leading up to his room who had intimated to him a desire to see them, that he did not admit any body up there because his gas works were out of order; that during the evening of the day last referred to the prisoner *Page 374 
having but recently returned dressed in a broad brim slouch hat, long black coat and pantaloons much soiled, to the Capital Hotel in Dover where he then lodged and boarded, suddenly rose from his seat in the bar-room between the hours of 11 and 12 o'clock that night, and remarked that the hands of the clock in that room moved faster than at his office and hurriedly left it, having just before observed that his retort was leaking, and he was afraid of an explosion; and in about an hour afterwards the keeper of the adjoining saloon was awakened in his bed by a cry of fire, and heard the crackling of the flames in the prisoner's rooms, and on breaking in with the assistance of another the front doors at the foot and at the head of the stairs, both of which were locked, and entering his front room they found the windows of it fastened down, and the door of it which they had just broken in, on fire and a very large dry-goods box placed against the door between it and the back room also on fire, the front room filled with stench and smoke, and on the burning box with some paper and rubbish saturated with coal oil under and about it, a human body without a head, feet or hands, entirely skinned and also saturated with coal oil. The wrists and ankles were broken and crushed where the hands and feet had been severed from it; and four or five feet from it in a hole bored in the floor of the room, but which the fire had not reached, about a half a pound of gunpowder folded in paper funnel-shaped had been placed with some loose paper saturated with coal oil about it. A hatchet and a heavy iron bar fourteen or fifteen inches in length were also found in the room. But without making further material progress the fire in it was speedily extinguished. That at 4 o'clock that morning the 4th of Dec. 1872, the prisoner entered the rear car of a railroad freight train with a passenger car attached from Wilmington to Delmar at the Dover station, stating to the conductor of it that he was from Little Creek Landing and was going to Norfolk; but he had no other baggage than a small rolled bundle tied round with a piece of rope, and that he sat in *Page 375 
one place through to Delmar with the collar of his coat turned up and the rim of his slouch hat drawn down over the sides of his face and his head inclined forward, as if he wished to avoid recognition by any one, and left it at that place where the train stopped. He voluntarily returned, however, in the afternoon of the following day, to Harrington, where he enquired for a constable and said in the presence of several persons at the railroad station there that he was Isaac C. West and wanted to be arrested, and when he was asked what for, stated that he had stabbed and killed a negro and that he did it in self-defense, and when asked why he had done it, said that he had employed him to do some work and when he was in the act of paying him for it, he took up a hammer and threatened to kill him, and he then took up an iron bar and struck him with it and killed him. He was then told of the fire in his rooms at Dover, and was asked if he knew any thing about it, when he said he had arranged that it should burn before he left there. He was not arrested, however, at Harrington, but the same afternoon voluntarily entered a railroad train there, came to Dover and surrendered himself into the custody of the sheriff of the county.
The Coroner had not then concluded his inquest in the case, and the prisoner having requested of him permission to make a full and free confession was brought before the jury, and in the presence of the coroner and the jury after being duly admonished that he was not bound to criminate or bear evidence against himself, made the following voluntary confession which was reduced to writing by the secretary of the coroner, and after being read over to the prisoner was approved and signed by him.
My name is Isaac C. West, Jr.; will be thirty years of age the 29th of next May. I am a native of Sussex County; have been in Dover and about there for several years. Do not claim to be a physician. I have been administering gas for the treatment of diseases. On Monday morning, December 2d, I was taking a bucket of water up to my *Page 376 
room. Turner came along, and said "Boss, I'll carry that up for you." I told him I'd carry it up myself; but that I had some work for him to do. He said he would do it, and wanted to know what it was. I told him I had a large box at Capt. Battel's which I would like him to bring around. He said he could not carry it around then, that he was cutting up meat for Mrs. Mullen, but said he would do it sometime in the afternoon. I went to Mrs. Mullen's about one o'clock; there were some colored men there who said Turner had not been there and they did not know where he was. I met him on the street about three o'clock; he said he was ready to carry the box for me; he got a wheel-barrow from Mr. Collison and took the box up to my room for me. My room is in Kirbin's building. I took out my pocket-book and paid him twenty-five cents. He said "boss you seem to be pretty flush." He said won't you give me a drink, or something to get a drink. I said I would if he would go down to the bar next door. He said then, after he got his supper, he would come back and get water to fill my gasometer, that he would not charge me anything for that as I was so good to him. We went down together and I paid for Turner's drink at Levy's bar. Sun was then about half an hour high. We came out together, then separated. As we came out of the door he said "boss, I'll be on hand in about half an hour," or by "sunset." I met Turner again between that time and sunset, near the post office. He said he was ready to go and take the water up. I told him I was not ready then to go to the room. In a short time after that I met him near Hoffecker Stewart's store; he was talking with some colored man. I passed him and went on up to my room in Kerbin's building. I had just got there and unlocked the door when Turner came up. I went on up stairs ahead of him and unlocked the room door up stairs and went in ahead of him. I had taken my gasometer to pieces that day intending to fasten a small sledge hammer I had taken, there to the weights. This sledge hammer was sitting just inside the *Page 377 
door. The other weights were over in the corner about eight feet further on. One of the weights was a bolt, or piece of an axle. It was about two feet long and about an inch and a quarter in diameter. I had just got about where this bolt was sitting when. I turned and saw Turner with the hammer in his hand. As soon as he saw I saw him, he said: "Give me your pocket-book or I'll kill you." I snatched up the piece of axle. Just as I did so he struck at me with the hammer. He struck me on the top of the hat, dinting the hat in but not touching my head. I was stooping over. I struck at him with the bolt or piece of axle, intending to strike him on the head, but missed his head and struck him on the neck, below the ear. He fell, and I don't think he ever breathed afterwards. This was just after sunset. He fell over on his side. I then felt of him; felt his pulse and found that he was dead. I did not intend to kill him, but only to knock him down, so that he would not kill me. I left the body lying there. Came and got my supper at Mr. Fountain's hotel. I did not go back any more that evening. I went back again on Tuesday morning about 10 or 11 o'clock. I then thought I would cut him up in pieces and carry him off and bury him. I cut off his head and feet, and skinned the body. I did it with a penknife, having previously broken several of the bones with the bolt or piece of axle. I came up to Mr. Fountain's for dinner. This was not all done before dinner. I do not remember how much I did do before dinner. Had no fire in my room. Do not know the exact time I went to dinner. Did not go there any more that afternoon. Don't remember positively whether I went back or not in the afternoon. That afternoon I got a horse and carriage from Mr. Fountain and went out to Hazlettville, thinking it would be dark when I came back and I could take the remains away. It was dark when I got back — about 6 P. M., Tuesday. I brought down the skin of the man in a water bucket; had a piece of paper over top of the bucket, which was about full. The horse smelt it and would not let me take it. I set it down just *Page 378 
inside the outer door and locked the door. I then took the horse and carriage to the stable. I went to the hotel and warmed myself. I then thought I could carry off the remains in a bucket and bury them. I got my supper at Hazlettville. I went to the room about 8 o'clock. I then took the bucket that had the skin in it and started out on the street with it. Had not got far before there were two dogs after it. I went out Loockerman street and through the new street recently opened as a continuation of New street. Found the ground frozen and I had nothing to dig a hole with. I then turned and brought it back to my room again. I then remained in my room awhile thinking what to do. I concluded I would tear the large box I had there to pieces and make a box that would hold the remains and ship them on the railroad to some point, and follow them and bury them. I found it was getting late, and that I could not stay any later that night. I then came to the hotel and went to bed, and suppose it was about eleven o'clock Tuesday night.
On Wednesday my foot was hurting me and I did not go back to my room early — suppose it was as late as nine o'clock when I went there. I found the remains smelling so that I was afraid to ship them on the railroad. I was about at different places in the town during the day until the afternoon. Got my dinner at the hotel. I went back to my room about 2 o'clock. I took my knife and cut some pieces of flesh from the remains — about the abdomen. I cut the lips and nose off the head. I struck the head with the bolt or axle. I am under the impression that I struck it before cutting the nose and lips off, intending to mash the head up so it would not be recognized. Could not make any impression on it. It was my intention to skin the head — but thought if I only skinned it it would be recognized. I put the head in a bucket and took it out to a lime heap near the railroad. Emptied it out, put some lime in the bucket and raked the head back into the bucket and carried it to the place where I buried it — I had a spade I found leaning against Mrs. Jones' outhouse. *Page 379 
I buried it under a heap of dead briars, near the corner of Water street and the railroad. I went back to the room about ten o'clock at night, had a candle and two lamps in the room — one lamp for alcohol and the other for burning kerosene. I took the bucket and put the skin in it to carry it away. I went out on the street with it; saw some one coming and took it back into the room again. I melted some tallow off the candle and stuck the candle up on the floor. I then took one of the feet and poured alcohol over it and set fire to it. I wanted to see if the alcohol would change the color of the skin. I spilt some alcohol on the floor; that also caught fire. I had that night, before doing this, piled up the box and pieces belonging to it over the body. I intended, if the alcohol did change the color of the skin on the foot, to throw the skin of the body on the floor and change the color by burning alcohol on it. I found the burning alcohol did not change the color of the skin. I intended, if it did, to put the skin back on the body and fit it as well as I could. When the alcohol on the floor caught fire I gathered up the feet, hands and skin in my hands and got out of the room as soon as I could. I tried to fan the fire out. Turner had knocked over a can of kerosene that was sitting on the box on Monday. I walked toward the Methodist graveyard with these things in my hand. After I had got off a considerable piece from the house, I saw that the fire had gone out — did not see the lights burning. I started to go back to the room again — was afraid to go back knowing that the candle was sitting on the floor burning. I had gotten up near Mrs. Jones' new house when I saw the fire flash up again. I then turned, went back towards the graveyard, where I had left the hands, feet and skin. I took them up and carried them over into the Methodist graveyard and waited there until the fire was put out. I then went and buried the skin alongside the railroad. I started up to get the hands and feet to bury them when I heard the whistle of the 4 P. M. down train. Raked some lime over them, went up to the depot and waited until the *Page 380 
train came. I got on board the train with a bundle of clothes and went to Delmar and walked down the railroad track to Salisbury. I had taken the clothes out before and hid them. I went to Tracey's hotel in Salisbury and remained there until this morning, (Friday,) then got on the train and came up to Farmington. Got off the train at Farmington. I then walked up to Harrington and got on the evening train and came to Dover and delivered myself up to the Sheriff, who was at the depot. While at Harrington I called for a constable, intending to surrender myself.
My life is insured to the amount of $25,000 — $10,000 in the New England Mutual, $5,000 in the John Hancock, $5,000 in the Ætna, and $5,000 in the Delaware Mutual — about one-half of this amount is in favor of my wife and the balance for self. The policies are all paid up and alive. Took out the Ætna policy five or six years ago — the others last spring.
I never had any difficulty with Turner — had no enmity against him — knew him only by name — never having exchanged words with him until that day — thought his name was Joe Turner — had axle in both hands and struck him on the right side towards the back of his neck. One blow was all I gave him — that killed him — don't think he ever breathed after I struck him. I felt his pulse as soon as I could compose myself — it had ceased beating. I had some powder in a place where I had bored a hole to fix a post. I took the powder out of the desk and put it in there. I upset a lamp on the desk once, and thought that it was a dangerous place for it. Kept a board over the hole. Bored the hole about a month ago with a brace and bit I borrowed of Captain Battell or Fred Croyden, I don't know which. I made the hole for the purpose of settling a post in it to hold my retort. In making the hole missed the joists and the hole did not answer my purpose. There was nothing in the room to explode.
The bundle of clothes I took on the cars with me contained a circular cloak, a coat, a pair of boots, and three *Page 381 
shirts. I bundled them in my room, at Kerbin's building. I took them out about 10 o'clock Wednesday night to the back of Holland's store, and left them in the graveyard until I heard the train, when I got them and took them to the platform. The clothes are now at the Dover depot, in a bag I bought at Salisbury. The blow I gave Turner broke his neck. I tore Turner's clothes up in strips so that they would not be recognized — they consisted of a coat, a pair of pants and a shirt — cut the uppers off the soles of his shoes. Threw the soles out on the street, left the uppers with the torn-up clothes on the bench, intending to carry them off and bury them. The front shutters of the windows were closed when I left. I was afraid to go back to the room on account of the gun-powder.
The portions of the body were soon afterwards found in the places detailed and described by the prisoner.
The prosecution, after the reading of the confession in evidence, called, among other witnesses, Frederick Windolph, a citizen of Dover, who testified that the prisoner came to his place of business several times; the first time about the time he rented his rooms, four or five weeks before the killing of Turner, when he was looking for a room to rent, and afterwards enquired for him when he was not in. The second time was at his place of business, about a week before the killing. They were pretty good friends, and that time he came in about dark, and talked about having been down to his father's, and the weight of himself and his brothers who had been weighed while he was there, and said their average was about two hundred pounds, and then he asked him (the witness) how much he weighed and he told him about a hundred and eighty pounds. He next asked about his height, and they were then measured by another person, and the prisoner then placed his hands on the witness' chest and said they were about the same size; but he was the tallest by an inch and a half, while the prisoner was the largest round the chest; and that the prisoner asked him at two different times to visit "him at his rooms, and once stopped him on the *Page 382 
street and said to him he wanted him to come to them.
An agent of a Life Insurance Company was then called and sworn as a witness, and was asked the question, what would be the annual premium upon a policy of $25,000, on the life of a person twenty-nine years of age?
It is competent to prove that the prisoner had a motive for committing the crime with which he stands charged.
The witness then answered that it would be about $25 per year on a $1,000 policy, and at that rate on a policy of $25,000, or about $600.
The testimony on behalf of the prisoner was, that his father had been of unsound mind for a period of about three months in the year 1836, and that the prisoner when sixteen or seventeen years of age fell from a load of fodder on very hard ground and was insensible for awhile and sick for some time afterwards; and that whilst he was at school in Dover in the year 1869, he walked all the way from there to his home in Baltimore hundred, and said he had been out two nights on his journey, one of which he spent in the woods, and the other in an old tent near Millsboro, and that he had not been at or in a house since he left Dover. The reason he assigned for it was that he had dreamed that his mother was sick, and a lady at the house where he boarded had dreamed the same thing, and the first remark he made to his mother on entering his home, was that he expected to find her *Page 383 
sick and in bed. He had also when a boy suffered a severe fall from a swing, and was sick and fainty for three weeks afterwards, and complained much of pain in his head and back; and last summer while on a visit to his father's in Baltimore hundred he acted strangely, and on the Sunday during his stay there got two cats, washed them in water and hung them up in a basket to dry. In the latter part of the year 1869, he applied to an acquaintance in Baltimore hundred for a very old newspaper which he had in his possession containing the inaugural address of President Jefferson, and when asked what he wanted it for, replied that he wanted it for a museum which he was going to start in the town of Milton in that county. The same person saw him next at a basket meeting in Worcester County, Maryland, in August last. He drove up in a horse and wagon with his wife and child, and after hitching his horse, he got in and out of the carriage twenty-five or thirty times in the course of two hours and a half. He would appear each time to do something to the horse or harness, although neither seemed to require anything at all to be done to them. The same witness next saw him in September following, at a political meeting in Georgetown, Delaware, where he acted strangely, and had a dog with him, and when he asked him what he was going to do with the dog, he replied that he was going to present him to General Grant; and said it seriously.
Another witness, Dr. John O. Pearce, stated that he had been intimately acquainted with the prisoner several years and had first observed a marked change in him in the fall of 1872. At that time he went with him by his request in a private conveyance from Milford to Georgetown. He was then going there on his gas business, and was about to purchase the fixtures for it. The witness also detailed several particulars in regard to his change of manner and his conversation on their ride back to Milford, which constrained him to feel like avoiding him in future, and that he would not like to be alone with him again, as he then was, and that he then came to the conclusion that his mind was unsound and disordered. *Page 384 
Another witness who had been several years ago a pupil of the prisoner when he was a teacher of a public school in Milton, Delaware, testified to his strange taste and passion at that time for unique or curious things of no value, even as curiosities, and of digging for human bones, and his catching, killing and dissecting frogs, and of his collecting such common things in the neighborhood for what he called his museum; and several other witnesses followed, who also testified to their long and familiar acquaintance with him, and to the striking change which they had observed in his appearance, character, conversation and conduct prior to the occurrence in question; whilst on behalf of the State they were met with the counter testimony of a number of other witnesses who were also well acquainted with him, who had observed no such change in him, but, on the contrary, had always regarded and considered him of sound mind.
During the production of the evidence on behalf of the prisoner, and among the last of the witnesses called and examined by the defense, was Thomas Battel of Dover, who testified that when the prisoner removed from Dover to the city of Baltimore, he packed up his things in a large dry-goods box, and among them the articles he had been selecting for his museum, and when he returned here from Baltimore last summer, he brought the box back with those articles in it, and left it at his shop in his charge, where it remained until the 2d day of December last, when the deceased carried it from there in a wheelbarrow to the prisoner's office on Loockerman street. Before that was done the prisoner had applied to him to make him a table for his office, when he suggested to him that he had an old table that could be soon repaired which would answer his purpose, or what would be still better, he could take his box then there, which would serve the double purpose of a table, and for the storage of such rubbish as lay around his office. The prisoner approved of his suggestion, and had the box emptied there of its contents and taken to his office, as before *Page 385 
stated, but some of the old papers and pamphlets which were in the box were taken away with it.
The counsel for the prisoner now applied to the Court for leave to produce before the Court and jury the collection of articles which had then been removed from the box and left in the shop and possession of the witness.
The Attorney General objected to the leave asked for, as entirely novel and unprecedented, and unwarranted by any rule of evidence or practice in criminal cases.
But the Court, after deliberation, granted the leave and ordered the articles to be produced.
They consisted of, a few snakes preserved in bottled spirits, insects, odd-shaped stones, buck-horns, an old shoe and an old umbrella, and a frame mirror badly fractured, together with a variety of other articles of no novelty, and as common as valueless, even as curiosities.
The witness, when further examined in regard to them, stated that he found the old shoe in the box carefully wrapt in paper, and with a sheet also wrapped about it, while the looking-glass, which had cost considerable money, had been put into it without any thing about it to protect it from injury, and which had been very much cracked and broken in the box; and when he laughed at the prisoner for taking so much care of an old shoe, and none of the looking-glass which was of some value, he replied that he would part with his right arm sooner than he would with that shoe. He then told the prisoner he was a crazy man. The prisoner had several times talked to him about his museum and about his gas, and his sanguine expectations of making a fortune out of it, and he had pronounced him to be a crazy man in his opinion some time before the killing of Cooch Turner.
Bates, Deputy Attorney General. The killing of the deceased by the prisoner at the bar was murder with express malice aforethought, and of the first degree under the statute, or it was no crime or offense whatever in contemplation *Page 386 
of law, horrible as had been his efforts by the mutilation of the dead body to conceal and falsify the identity of it, from the time he committed the act, until he fled from the scene of it; and until soon becoming conscious of its enormity, and that it could no longer be hidden from all eyes but his own, he concluded after his escape beyond the limits of the State, and a full day and night's reflection on it, to return to the locality of it, surrender himself to the Sheriff of the County, and to make a free, deliberate and voluntary confession of it before the Coroner's inquest', which was then still engaged in the investigation of the homicide, and which at his own instance and request was so made by him, and was reduced to writing and read to him by the secretary of it, and was then approved and subscribed by him.
The defense which they were to meet in the discussion of the case before the Court and jury was of a two fold character. As alleged and presented by the prisoner himself in his confession, it is self-defense, merely, that is to say, that he killed the deceased, which he admits, in self-defense against a sudden, unprovoked and imminently dangerous assault made upon him by the deceased with an uplifted hatchet, and which, whether true or false, is at least rational on his part; for whether true or false, it certainly exhibited soundness of mind, reason, judgment and reflection of a pretty high order on his part, to conceive and assume for himself, without the aid or advice of legal counsel, such a ground of defense in the case. The other defense which has since been raised, was an afterthought, and has also been adopted and espoused by his counsel, which is that of insanity, the last desperate defense now generally made and relied on in all desperate cases of willful and deliberate murder which cannot possibly admit of any other, even specious defense, than that, the last refuge of a guilty murderer. They were evidently inconsistent, however, with each other, and could not stand together; for it was impossible to believe that if the prisoner was in fact insane when he killed the deceased, *Page 387 
he could have been actuated and justified in doing it by such a sane and rational motive as that of self-defense, as the same is defined in the law on that subject. The defense of insanity, therefore, in effect, contradicts and denies the defense of the prisoner as made by himself in his confession, that is to say, that he killed the deceased in self-defense against a deadly assault made upon him by the deceased. Indeed, the confession itself is wholly and utterly inconsistent with the defense of insanity which has since been set up in the case; because it would otherwise involve the necessity of imputing to it a rational motive for the act.
There could be no doubt that the dead body found, though skinned, disfigured and horribly mutilated otherwise, was the dead body of Cooch Turner, and that he was the victim of the homicide now under consideration, and that he was killed by the prisoner at the bar. That was clearly established by the written and voluntary confession of the prisoner taken by the coroner at the inquest, and confirmed by the finding of the several portions of it where he had buried and concealed them unknown to any other person, and where he had voluntarily directed them to be searched for. His confession with that corroboration conclusively establishes that fact beyond any doubt whatever. But, although the whole of the confession, and every declaration or statement contained in it, as well those which are in his favor, as those which are against him, are in evidence before the Court and jury in the case, and must be taken into consideration by the jury, it is now a well settled principle of law that the jury are not bound to believe what he says in it in his own favor to be true, because the confession has been put in evidence by the prosecution on the part of the State, but you are to consider and weigh such portions of it with all the facts and circumstances proved in the case, and determine after doing so, whether you believe it or not; for it is equally well settled as a principle of law, that the jury may believe one part of the *Page 388 
prisoner's confession or admission, and disbelieve another part of it when it is so put in evidence against him. They may believe that part of it which" charges, or makes against him, and discredit and reject that part which makes in his favor, if they see sufficient grounds in the whole proof in the case for so doing. In such cases in determining whether the part in the prisoner's favor be true or not, the jury must consider whether it be probable or improbable in itself, or whether it be consistent or inconsistent with the other facts and circumstances proved in the case. If what the prisoner has stated in his confession in his own favor, is not contradicted by the evidence otherwise produced by the prosecution, not improbable in itself, it will naturally be believed by the jury; they are not, however, bound to give weight to it on that account, but are at liberty to judge of it like other evidence, by all the circumstances in the case. 1 Arch. Cr. Pr. Pl. 410, and the cases cited in the notes thereto.
Now, as to the probability of the statement of the prisoner that the deceased made a sudden and dangerous assault upon him, and he killed him in self-defense in the manner alleged in his confession, can any one possibly believe on his statement merely that an inoffensive, drunken negro who loved liquor as well as Cooch Turner unfortunately loved it, and who had just been generously treated by his employer, the prisoner, to a full glass of raw brandy, would or could so soon afterwards in the prisoner's own office with houses immediately adjoining it on either side and occupied by neighbors so near at hand, even think of making a deadly assault on such a stout, athletic and perfectly sober man with a view to rob him of the money he then had about his person, under such circumstances and in such a situation? It would seem improbable and incredible in the highest degree, and past the belief of any reasonable mind, even if there were nothing in the facts and circumstances and in the action and conduct of the prisoner afterwards in regard to the matter, as proved in the case, to impeach and discredit *Page 389 
the truth of the statement. If that was so, why did he prolong his laborious efforts for several days and nights in secrecy and silence to destroy, not only the color and skin of his victim, but even the last vestige by which the body could ever be discovered to have been that of a black, instead of a white man? And why after the skin, head, hands and feet had been severed from it and removed to the places where they were afterwards found by his information, were such particular preparations made by him to burn the residue of the body in his office, and his last act in the shocking and revolting tragedy, was to deliberately set fire to the room and building in which it lay for that purpose, and steal secretly and silently away from it in the darkness of the night to a safe and secure position where he could observe unseen the progress of the flames which he expected every moment to see burst forth from it; and when that last hope and expectation had failed him, why did he then steal as secretly and silently away from the scene at 4 o'clock in the morning with a falsehood on his lips and disguise on his person to that early train, and flee like a criminal and a fugitive from justice into another State? Could all this have been done, and could such have been the course which any man of the prisoner's nerve and intelligence would have pursued, who was honestly convinced in his own mind that he had killed a negro robber in lawful self-defense?
The State will contend that all these facts are not only utterly inconsistent with any such statement or pretension, that the killing was done in self-defense, but that they clearly indicated a purpose and intention on the part of the prisoner to do more than merely to murder Cooch Turner; and that was by means of his dead body thus horribly mutilated and disfigured by him, to accomplish another and ulterior object, then so near and dear to his wicked and avaricious heart that he was even capable of doing all this in order to attain it. For it is upon these acts and the evidence afforded by his confession in relation to the aggregate insurance of twenty-five thousand *Page 390 
dollars on his life in the life insurance companies mentioned in it, the State confidently bases the charge against the prisoner that he deliberately murdered the deceased, and then as deliberately skinned and mutilated and disfigured and attempted to burn so much of the trunk of it as could be consumed in that manner, by setting fire to the room and the building in which he left it, in order that such remains of it as survived the burning of the building might be mistaken for the remains of his own body, in the melancholy belief of an unsuspecting public that his own life had been unfortunately sacrificed by a supposed accidental explosion of his gasometer, and had been so far consumed in the burnt building, which was to be fired for that purpose also, as to be past all possible recognition as the remains of any body else when found; and to consummate the plan of this atrocious design, his further purpose was forthwith to disappear unseen forever from this place, and from the sight of all persons if possible, who had ever before known him. And to show how near he came to the successful accomplishment of this wicked and diabolical scheme of combined fraud, villany and murder, such was in point of fact the general, if not the universal impression in the town of Dover that morning, as soon as the fire in the room and the finding of the dead and then unknown body in it, became known in the community. And that the first and last and only motive of the murder, and of his subsequent steps with regard to the body was his hope and expectation that such would be the unquestioned assumption and belief every where and that the money payable on his life insurance policies could, on the presumption of his death, be obtained by his executor, or his executrix without much delay; and, particularly, without having to pay any more premiums upon them, or else forfeit them entirely, and which he was now finding it impossible for him to do, if he did not know it when he increased the amount of them to $25,000 and the annual premiums to be paid by him on them to $600, but a short time before this atrocious step was taken by him. *Page 391 
As the law presumes a man to be sane until the contrary appears, it imposes on every one who seeks to avail himself of the defense of insanity in either a civil or criminal prosecution against him, theonus or burden of establishing such defense to the satisfaction of the jury, and unless it satisfactorily appears to them from the facts and circumstances proved, and all the evidence before them in the case, that the accused was insane when he committed the offense charged against him, and there is no other or better defense established in the case, it is their duty to convict him of it. And as to the condition and degree of unsoundness of mind which the law requires to be shown to the satisfaction of the jury in order to establish the defense, the legal rule and criterion is that if the accused had at the time of committing the offense charged, sufficient soundness of mind, reason and reflection to be able to distinguish between right and wrong in reference to the act itself of killing the deceased, and the power to choose whether he would do it or not, he is held in law criminally responsible for it; and if that appears to the satisfaction of the jury, no peculiarity of taste or habits, no eccentricity of character, or strange or striking change in his appearance, conversation or conduct, and no defect of moral sense or perception, or in the ordinary instincts of our common nature and humanity, and even no weakness or unsoundness of mind can suffice to exonerate him from his criminal liability for the offense. 1Arch. Cr. Pr. Pl. 20, 37, 38. 2 Greenl. Ev. Secs. 372, 373.State v. Windsor, 5 Harr. 538, 539.
W. Saulsbury, for the prisoner. The character of the accused from his youth up to the occurence on which the prosecution is founded for the crime of murder of the first degree, was without a stain, and it would be hard to believe without the strongest proof of the fact, that the first offense of such a person could be a crime of that degree. The counsel for the State however seem to have mistaken the nature of the defense which would be *Page 392 
relied on in the case, and to consider it, as if he had confessed that he killed the deceased and pleaded specially the matters of defense relied on by him, which he would be bound to prove to the satisfaction of the jury beyond a reasonable doubt in order to avail himself of the benefit of them. But such was not the case presented on the record before them. For the only plea in the case is, not guilty, and that, on the contrary, imposed the duty on the State of proving him guilty of the crime with which he stands charged, to the satisfaction of the jury beyond a reasonable doubt.
The prisoner at the time of the homicide had so little acquaintance with the deceased that he did not even know his name, but called him Henry, instead of Couch Turner, and he therefore could have had no malice or enmity against him prior to the provocation and deadly assault made upon him as stated in his confession. And the important fact here presents itself for the consideration of the jury that but for that confession voluntarily made by him, neither the Attorney General, or his deputy, or any one in this community even, would have known who it was the prisoner had thus killed, or where the missing portions of his dead body were to be found. Indeed, there was not a single fact or circumstance in the case of any material weight or importance to the State in the prosecution of it, that was not communicated and disclosed by the prisoner himself; and which he voluntarily returned into the State after having passed a short distance beyond the borders of it, to make fully known to them. And here he would remark to the jury that in consideration of this fact, it would become their grave and solemn duty to give proper weight and effect to the whole and every part of the confession, as evidence in the case produced by the State itself, to that which was favorable to him, as well as to that which was against him; for they could not, at their mere will and pleasure capriciously or arbitrarily discredit or reject any part of it, or any statement in it, as unworthy of belief, and credit *Page 393 
only so much of it, as without such statements, would suffice, perhaps, to convict him of the crime with which he stands charged. All parts of the confession, must therefore, be taken and considered together by the jury, as one statement, complete and inseparable into parts. And more particularly was that the rule of law on the subject, when the confession consitutes the only evidence on which a conviction can be had. The jury, were therefore, bound to consider the statement contained in his confession that he killed the deceased in self-defense against a deadly assault made upon him by the deceased with the intent to rob him, as much as the statement and admission which it contains that he killed him, because it was part and parcel, and a qualification of his statement and admission that he killed him; and in the consideration of his confession which was the only direct evidence before them on that most material point in the case, they could not be disconnected or separated from each other.
But one of the first and perhaps, best definitions of the crime of murder we have in the books is given by Coke, 3 Inst. 47, and which according to his description is when a person of sound memory and discretion unlawfully kills any reasonable creature in being and under the King's peace, with malice aforethought, either express or implied. And by it you will observe that the first thing required in law to constitute the offense is that the person who unlawfully kills another should be at the time of sound memory and discretion, or in other words, of sound mind and competent understanding to be criminally responsible in law for it. And this soundness of mind, memory and discretion it is just as indispensably necessary for the State to prove on every indictment for the crime, to the satisfaction of the jury beyond a reasonable doubt, as it is to prove the act of killing itself; and when the prima facie presumption of sanity, or soundness of mind is rebutted by sufficient evidence of insanity, to raise a reasonable doubt in the minds of the jury as to the sanity of the prisoner at the time of committing the act, the burden of *Page 394 
proving his sanity to their satisfaction beyond a reasonable doubt, rests on the prosecution. Because the prima facie presumption in law that he was then of sound mind, is at least counterbalanced, if not over-weighed, by the legal presumption of his innocence which still remains in the case. Smith v. Commonwealth, 1 Duv. 229, 328.Commonwealth v. McKey, 1 Gray 61. Although the rule of law on this point in civil actions is different, in which there are no presumptions either way, but the preponderance of the evidence prevails; while in actions ex delicto the burden of proving insanity rests on the party who alleges, or sets it up in the suit. 39 N. H. 171. 40 Ver. 556. 31 Ill. 393. And the sanity of the prisoner at the time of committing the act was as much involved in the question of his guilt or innocence in the case, as was his intention to commit it.19 Maine 398. 26 Maine 317. 24 Pick. 373.50 Maine 345. 24 Pick. 373. 43 N. H. 224. 16 N. Y. 58.40 Ill. 358. 17 Mich. 9, 20, 21.
He then remarked that although he was aware that they were not entitled to the weight of judicial decisions or legal authority, he would present the views of several scientific writers of acknowledged learning and ability on the subject of insanity, and read at considerable length fromAbercrombie's Mental Philosophy, and from the works of Ray,Richards, and Tayler on Medical Jurisprudence, to support the defense of insanity in this case, and on the evidence produced to sustain it.
As to the measures adopted by the prisoner to destroy and dispose of the body after he had killed the deceased under the circumstances detailed in his confession, and for the sole reason and purpose stated in it, which simply was to effectually destroy all the evidences of the act which he had just committed, it was not only a part of his confession which the State itself had put in evidence for the purpose of convicting him of the crime of murder contrary to the whole tenor and import of it, and which must be taken and considered by the jury in connection with every other part of it, and particularly, with his admission *Page 395 
contained in it, that he killed the deceased, but it certainly presented a much more reasonable explanation, and a much more probable account of the matter, than the purely imaginary and hypothetical reason and motive which the prosecution had ventured and presumed in the absence of any direct evidence whatever on that point, to assign for it. For had the motive and object of the prisoner been such as the prosecution confidently assumes and contends it was, and he had been so long meditating and maturing in his mind the design and the plan of its execution imputed to him, how much more feasible and safer would it have been for him to have procured at a comparatively trifling expense from the adjacent cities of Baltimore or Philadelphia, some unknown dead body of a different race and complexion, which would not only have suited his purpose much better, but would have saved him from the awful sin, crime and danger of deliberate murder? The mere theory and hypothesis of the prosecution that the whole thing was contrived and planned, designed and executed in such a manner after weeks and months of consideration and preparation for it, for the purpose of defrauding the life-insurance companies mentioned in the method proclaimed by the Deputy Attorney General, was therefore so improbable and incredible under all the facts and circumstances proved in the case, that he would leave it to them without further comment on the subject.
Lore, Attorney General, replied, that the killing of the deceased by the prisoner at the bar being proved as a fact, and not disputed in the case, the burden of proving to the satisfaction of the jury that it was done by him in lawful self-defense rests on the prisoner, and his own declaration or statement that it was so done, though made in his written confession, and then before the jury, was not evidence of it. It is a special plea or defence in confession and avoidance of the act of killing and its legal consequences, set up by the prisoner himself under the plea of the general issue of not guilty, the only plea in bar ever *Page 396 
pleaded in cases of murder; and it was incumbent upon him to prove and establish the truth of it to the satisfaction of the jury beyond a reasonable doubt, or it must entirely fail him as a defense in the case. And the same was the case with regard to the other and wholly inconsistent plea or defense of insanity, for the same rule of law and special pleading, or of setting up a special defense equally applied to it. For the law presumes every man to be sane, and to have sufficient knowledge and understanding to be legally responsible for the crime of unlawfully killing his fellow man, until the contrary satisfactorily appears; and therefore the accused to make good and establish his special defense on the second ground, was bound to prove to the satisfaction of the jury that he was insane and of unsound mind to such a degree that he was incapable of distinguishing between right and wrong in relation to the act of killing the deceased at the time when he committed it, and had not the ability by an effort of his will and understanding to choose whether to do it, or not to do it. There are various forms and degrees of mental derangement or insanity, but that is the true and only test established in law to determine the measure and degree of it in all cases of homicide that will suffice to exonerate the accused from criminal responsibility for it. 1 Arch. 37.Commonwealth v. Rogers, 7 Met. 500. State v. Bartlett,
43 N. H. 224. State v. Windsor. 5 Harr. 512. And on that point it was sufficient merely to remind the jury that the steps immediately taken by the prisoner, and secretly prosecuted by him, through several days and nights, to destroy the body of the deceased, in order to conceal the homicide, as he alleges in his confession, utterly negatives the absurd pretension that he was insane, and he did not know, or fully comprehend the nature and criminality of it.
The confession of the prisoner being judicial, as well as deliberate and voluntary in its character, and taken before the coroner, was the strongest species of evidence that could have been produced against him; and although, *Page 397 
the whole of it should be taken and considered together by the jury, yet no principle of law was better settled than that it is not to be supposed or understood by the jury that every part of it is necessarily entitled to equal credit and belief for that, or any other reason; but they may believe one part of it, and disbelieve another part of it, and may credit that which charges him, and discredit and reject that which is favorable to him, if all the facts and circumstances in evidence before them should lead their minds to that conclusion.
What could have been the motive and design of the prisoner in mutilating the body of the deceased to the extraordinary extent proved in the case, and admitted in his confession, and of removing the skin from it, and of his experimental effort in the first place by the means of coal oil to change the color of it from that of a black to that of a white man, the severing of the head, hands and feet from it, and carrying them off and concealing them at such a distance from the building in which the act was committed, while all the rest of the body was retained by him for so long a time, and until the room in which it was kept and the box on which it lay were set on fire by him at the moment of his final departure from it? Could all this waste of time and effort in such a labor have been the work of a man who had killed another in lawful self-defense, or in a state of momentary insanity even? Or of one who on recovering his self-possession, or his reason and reflection immediately afterwards, was only seeking to efface and destroy the evidence of the act in order merely to escape detection and to conceal it effectually from the eyes and the knowledge of every person but himself? On the contrary, did it not clearly indicate and denote a fixed and settled design and purpose on the part of the prisoner still worse and far beyond that? And taken in connection with the facts and circumstances proved in the case, the late extraordinary increase in his life insurance policies, his still later removal to Dover from the city of Baltimore, the peculiar business he here *Page 398 
engaged in, and its liability to explosion according to popular apprehension, and that the owner and operator of it would in all probability become the first and only victim of such a fatal catastrophe, and be consumed almost, if not entirely, beyond recognition and identification by even his most intimate friends and acquaintances, with the burning building and all his gas apparatus which would in that disastrous event perish with him, but leaving just enough of his mortal remains unconsumed in the general conflagration to satisfy the community and the insurance companies that he had lost his life in that unfortunate manner. And to insure against any possibility of Couch Turner's remains failing to be mistaken for his own when the building should be burnt and the mournful search should be made for what might be left of his, all this mutilation of the body of the deceased was deemed necessary by him, and was therefore done by him. At least, this is the belief and the conviction of the prosecution, and the shocking and horrible facts of this extraordinary and unparalleled case in the criminal calendars of the State, can only be accounted for on this theory or hypothesis, as counsel for the prisoner has termed it, which we have confidently and conscientiously based upon them; and which is certainly much more probable, reasonable and satisfactory than those which he has adopted or rather suggested merely, without even, so much as attempting to account for them. But even, if we are an error in assigning such a motive for these revolting acts of the prisoner, he is none the less guilty of deliberate murder as charged against him in the indictment on all the evidence before the jury in the case.
The Court, Gilpin C. J., charged the jury, that the scientific works on insanity read from by the counsel for the prisoner could not be considered or regarded as legal authorities in the case, except so far as the views expressed in them were sanctioned and supported by judicial rulings and decisions in the trial of cases of admitted *Page 399 
weight and respectability in our Courts of Justice; for without such support they were not properly entitled in the strict sense of the term to the title of works on medical jurisprudence by which they are generally designated, for the term implies so far as the subject of sanity is concerned and what constitutes it in consideration of law, that it has been so recognized and expounded in the judicial decisions of this and other countries, and therefore whatever weight and respect they may be entitled to, they cannot have the weight and authority of established law or jurisprudence on any point discussed or treated of in them, except so far as they are sanctioned and sustained as before mentioned.
On the trial of an indictment for murder, if the accused under the plea of not guilty, the only plea usually entered to such an indictment, sets up the defense of insanity, which admits by necessary implication that he committed the act of killing alleged in it, he is bound to prove, or it must appear from all the evidence in the case to the satisfaction of the jury beyond a reasonable doubt that he was so insane at the time he killed him that he had not sufficient soundness of mind and reason to be able to distinguish between right and wrong as applied to that act, and to understand the nature, character and consequences of it, and had not sufficient mental power to apply that knowledge to his own case, and had not through that knowledge and consciousness the ability to control himself, and to choose by an effort of the will whether, or not, he would commit the act; for the presumption of law is that the accused was sane, and of sufficient mental capacity to comprehend the nature of the act, to know that it was wrong, and to be criminally responsible for it, until the contrary appears to the satisfaction of the jury from the evidence. It was not for the Court to express any opinion upon the weight or character of the evidence on this point in the case, except to say that it is contradictory and conflicting, the witnesses for the State testifying in direct contradiction to those for the prisoner upon it, *Page 400 
and that the opinions of such as thought the prisoner was insane, or not of sound mind at any time referred to by them, should have such weight and consideration with the jury on this point as their intelligence and capacity and opportunities for observing and judging him, and the reasons which they have assigned for their opinions will respectively and properly entitle them to, and no more. And it would be for the jury to consider and determine how far this evidence taken in connection with all the facts and circumstances proved in the case negatives and rebuts the presumption of which we have before just stated, or is inconsistent with that presumption, and if so, whether it shows and proves such a state of insanity or unsoundness of mind and want of reason on the part of the prisoner when he killed the deceased, as to render him incapable of distinguishing between right and wrong with reference to it, of understanding the charater and consequences of it to himself, and was incapable through that knowledge and consciousness of choosing by an effort of the will whether he would do it; for unless the jury should be so satisfied from the evidence in the case, the defense of insanity can not be considered as proved and established in the case, and therefore the prisoner could not be acquitted on that ground.
The other ground of defense set up under the plea of the general issue, not guilty, is that the prisoner killed the deceased in self-defense, and which also, of course, admits the killing, and as the law presumes it to have been unlawfully and feloniously done by him, until the contrary satisfactorily appears from the evidence in the case, the burden of establishing that defense to the satisfaction of the jury beyond a reasonable doubt, also rests on the prisoner, unless it otherwise so appears from evidence produced on the part of the State. To constitute a lawful self-defense, such as would excuse or justify the killing of the deceased by the prisoner, so far as any evidence in this case goes, the jury must be satisfied that the deceased made a violent assault at the time upon the prisoner with *Page 401 
a deadly or dangerous implement likely to produce death or enormous bodily injury, and that the prisoner was in imminent peril of being killed or so injured by it, and that without having the time or the means of retreating from or avoiding such an assault upon him, he killed the deceased in repelling it. For if such was the case the killing was excusable and justifiable.
The only evidence before you on this point consists of the declarations of the prisoner himself, contained in his free and voluntary and deliberate confession taken before the Coroner of the County and the jury of inquest in the due discharge of his official duty in the premises, and reduced to writing and approved and subscribed by the prisoner, which invests it with what is termed the character of a judicial confession, and the highest sanction which pertains to a criminal confession in contemplation of law. And as the Court has been asked to charge you as to the weight and effect of it before the jury, particularly, as it was produced and put in evidence on the part of the State, we now say to you that that circumstance can give it no other or further weight or effect in your consideration of it on this point, than it would otherwise be entitled to in law, and that the law on the subject of such a confession when in evidence before a jury on a criminal trial of the party who has made it, is well settled and defined; and it is this, the whole of the confession is to be duly considered and weighed by the jury, but it is not to be supposed or assumed that all parts of it, or all the statements contained in it, are entitled to equal weight and credit as evidence in the case; on the contrary, the jury may credit and believe that part, or so much of the confession as charges the prisoner, or is against him, and discredit and reject that part, or so much of it as is in his favor, or tends to excuse or exonerate him, if they find sufficient ground for so doing on a full consideration of all the evidence, and of all the facts and circumstances proved in the case before them. If what he has said in the confession in his own favor is not *Page 402 
contradicted by evidence produced by the prosecution, or is not improbable in itself, or inconsistent with other statements contained in it, or with all the facts and circumstances proved in the case, it will naturally be believed and credited by the jury; they are not, however, bound to give weight to it on that account, but are at liberty to judge of it like other evidence, by all the circumstances proved in the case.
If either of the defenses, made had been proved and established to the satisfaction of the jury upon all the evidence before them, you should acquit the prisoner, otherwise it will be your duty to convict him in manner and form as he stands indicted, that is to say, of murder with express malice aforethought, and of the first degree under the statute.
The jury after five hours deliberation returned a verdict of "not guilty."