JOHN PEARL v. THE STATE.

No. 2178. Decided June 12, 1901.

**1.—Continuance.**

An application for continuance was properly refused where there was a lack of diligence on the part of defendant to secure the attendance of witnesses and where the proposed testimony was probably not true.

**2.—Same—Deposition.**

An application for continuance to procure the deposition of a witness is properly refused where the rules with regard to the taking of depositions have not been complied with.

**3.—Argument of Counsel—Practice.**

A remark by the State's counsel in argument to the jury, that they should "return a verdict in this case that will be approved by the good citizens of Brown County," is not calculated to injure defendant; and, if such remark was erroneous, defendant could not be heard to complain of same when he did not tender a special charge to the court to instruct the jury to disregard it.

**4.—Failure of Defendant to Testify—Charge as to.**

It is not error for the court to instruct the jury that the failure of the defendant to testify in his own behalf should not be used against him.

**5.—Murder—Circumstantial Evidence—Charge on Murder in the Second Degree.**

On a trial for murder, where the evidence, although circumstantial, shows that deliberate, cool design evidencing murder in the first degree for the purpose of robbery, the court is not required to charge upon murder in the second degree.

**6.—Murder in the First Degree—Evidence Sufficient.**

See opinion for evidence stated which is held amply sufficient to support a conviction of murder in the first degree assessing the death penalty.

Appeal from the District Court of Coleman, on change of venue from Brown County. Tried below before Hon. John W. Goodman.

Appeal from a conviction of murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Ed Tusker, in Brown County, on the 5th day of December, 1900, by shooting him with a gun and pistol.

The opinion states the case fully.

*Coffee & Scott,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was indicted by the grand jury of Brown County on December 12, 1900, for the murder of Ed Tusker. In January, 1901, he was tried in said county and found guilty, the jury assessing the death penalty. On motion for new trial being made, the same was granted, and the venue of said case was changed to Coleman County. On February 27, 1901, the case was tried in said court, the jury finding him guilty of murder in the first degree, and assessing his punishment at death. We make a substantial statement of the facts proved:

E. N. Fields testified for the State, that he knew deceased in his lifetime, and that deceased lived about five miles south of Bangs, in Brown County. Saw deceased's body when it was taken out of the tank, about half of a mile west of his house, on December 11, 1900. Had not seen deceased for two weeks prior to the time of his body was taken out of the tank. Jesse Perry (city marshal of Brownwood), Walter Edwards (deputy sheriff of Brown County), Walter Early (county attorney of Brown County), J. H. Miller (bailiff of the grand jury), witness and others, were at the tank when deceased's body was taken out of the same. Deceased, at the time of his death, had the following property: About three acres of good millet, which had been harvested; fifteen acres in corn, not gathered; twenty-five acres of cotton, most of which had been gathered; three grown horses and a colt and wagon, a few small hogs, and some chickens. Deceased lived on a rented place. This is all the property of deceased, unless he had a little money. The property, in all, was worth four or five hundred dollars. Witness noticed what appeared to be a gunshot wound over deceased's right ear, a small cut in the right eyebrow, a bruise about the mouth and also lower lip, and a scratch or rubbed place, on his right knee. These were all the bruises witness noticed. The body was nude, except an undershirt, that seemed to be rolled around his head, and a stakerope tied to his feet. The body was taken from the tank by means of a trawl line. One of the hooks caught in the wire fastened around deceased, raising the body to the surface of the water. There was fastened to deceased's body by the wire a rock weighing from sixty to 80 pounds. Before witness and the other parties began to drag the tank, they noticed a dragged place on the ground, leading to the tank from the direction of the house in which deceased had lived, and going into the tank. Witness noticed along this drag from the tank back to the house where deceased had lived a small horse track, shod all around, going in the direction of this tank. The track went into the tank at about the place where the drag had entered, and what appeared to be the same track came out on the opposite side of the tank.

J. H. Miller testified substantially as did Fields, and then added that he measured the track of the small brown mare pony, which pony one of the Barnes boys was riding on the day the body was found; and also measured the track along the drag leading from the house of deceased to the tank. The track and the size of the pony's foot measured were the

same size and shape. Could not say the track was made by the Barnes pony.

Edgar Barnes testified that he knew deceased and defendant. Had known defendant five or six months. Last saw deceased alive on the morning of the 5th of December. He and defendant were picking cotton in deceased's field. Saw them about 9 or 10 o'clock of the morning of that day. Next saw deceased on the morning of the 11th of December, 1900, when a crowd fished him out of the tank, about half a mile west of deceased's house, in his pasture. That he knew it was deceased's body that was taken out of the tank. After the morning of the 5th of December witness next saw defendant on December 8th, when he told witness he had bought deceased out, and had taken him to Brownwood on the night of the 5th, and that deceased had gone to Germany. Defendant stated he had paid deceased something like $200 for all he had,— crop, stock, wagon, and all. Witness bought a colt from defendant at that time, and paid him $10 for it. This colt had belonged to deceased. Witness knew deceased's property was worth $400 or $500. Witness took a load of cotton seed to Brownwood for defendant on the 10th. Defendant also took a load. Defendant sold both loads to the oil mill in Brownwood and got $10 a ton for the seed. There was about one and three-fourths tons of the seed. Witness knew that this seed had belonged to deceased, and it was taken out of deceased's house. Defendant never made any further explanation to witness about deceased having gone than as before stated. Deceased had no family, and lived alone, except when he had some one with him at work.

John Barnes testified: That defendant was his brother-in-law Edgar Barnes and Perry Barnes are witness' brothers. That he loaned defendant a little brown pony mare about two or three weeks before the 11th of December, 1900, who said he wanted to go to see his father, in Kimble County, to get some money. That he never saw him any more until after he was arrested on this charge. The pony loaned defendant was shod all around. Does not know how long it had been shod. Got the pony back from his brother on the morning of the 12th of December, 1900.

Perry Barnes testified that he had known defendant four or five months. Edgar Barnes, Wilford Gray, and witness picked cotton for deceased last fall and worked together. Knew deceased in his lifetime. This witness testified as to the trail or drag, and the taking of the body from the tank, substantially as did the witness Fields. Witness, Wilford Gray, George Barnes and witness' brother lived about one and one-half miles from where deceased lived. "On Saturday evening, December 8, 1900, defendant and Hank Wilson came over and ate supper with us. Defendant, Edgar Barnes, Wilford Gray, and Hank Wilson left, saying they were going to Bangs." On Sunday night, December 9th, Gray, defendant, and witness went to Clear Creek to church. On the way up there defendant's horse ran under a limb and skinned his face, and defendant bled on his shirt. Did not know whether witness tried to wipe the blood

off his shirt or not. Witness hired to defendant that night to help pick out the remainder of deceased's cotton. He said he had bought deceased out, and deceased had gone to Germany. Witness stayed at the former home of deceased Sunday night and defendant went to Brownwood the next day, and was locked up. Defendant had the little Brown mare at this time.

Wilford Gray testified that he knew deceased and defendant. Recognized the body of deceased when it was taken out of the tank on December 11th. Edgar and Perry Barnes, defendant, and witness picked cotton for deceased last fall, but had not picked there for about a week before. Deceased was a bachelor. Defendant said he had bought out deceased, and paid him $280 for everything he had, and that deceased had gone to Germany.

Walter Early (county attorney of Brown County) testified that he "was present the day Ed Tusker's (deceased's) body was taken from the tank. The house at which deceased lived was a small box house, consisting of one room and a shed room. We fished the body of deceased out of the tank with a trawl line. The line caught on a wire around the body of deceased, brought the body to the top of the water, when it was hauled to the bank and taken out. The body was nude, except a shirt wound around the head and a long rope tied to his feet. The arms were drawn up over the head, elbows bent. There was what appeared to be a gunshot wound above and behind the right ear that seemed to range forward and downward. The mouth seemed bruised, and lip torn upward at the corner of the mouth, a small wound in the right eyebrow. One knee seemed to have been rubbed or skinned upward, but only a skin wound; and the ball of one foot seemed to have the skin broken, and there were some small breaks under some of the toes. Witness was not positive that the gunshot wound was behind the ear, but that is his recollection. The body was taken out of the tank, and examined, and then the parties went to the house and found a lot of cottonseed banked up against the wall, two trunks, an old heating stove, and some old clothes. In the old heating stove some old clothes were found,—a shirt and a pair of old overalls. A pistol was found in one of the trunks. The witness identified the pistol shown him as the one found. The pistol was loaded all around, except one chamber, which appeared to have been recently fired. It was a 38-caliber pistol.

Will Barber testified that he saw defendant the first time on December 1, 1900. He bought a rope in Bangs, at Fitzgerald Bros., about thirty-five feet long. After buying the rope defendant tied a Spanish knot in one end and witness tied a Spanish knot in the other end. Witness cut the frazzled end off the end he tied, and left the frazzled ends of the strands of defendant's end. Witness identifies a rope exhibited to him as about the same size, same kind of rope, and about the same length as the one bought by the defendant, and a Spanish knot in each end of the rope, with the strands cut off near the knot on one end and longer on the other end. Could not say positively this is the rope, but it looks

like it. Any other rope off the same coil or similar coil, with knots tied the same way, and about the same length, would be hard to distinguish from the one defendant bought. "The last time I saw the rope, defendant was in Bangs, on December 5th, and took it off his own saddle, and tied it on the saddle of a boy with him." Witness noticed the rope and asked defendant if he was going to rope something, and he replied, "Yes, he was going to rope something that wouldn't get away, either." Did not know the young boy.

Sam Allen testified that he saw defendant a day or two before the 5th of December, when he bought the rope, and defendant and Barber tied Spanish knots in it. The rope was about thirty-five feet long, and about a half-inch rope. He also states the rope shown him is about the same size rope, about the same length, has a Spanish knot in each end, one end having the frazzled ends cut off, the other not, as the rope bought by defendant. On Saturday night, December 8th, defendant, Wilford Gray, Edgar Barns and Hank Wilson were in Bangs, and in the store of Fitzgerald, where witness was clerking, where they bought and drank sixty-four glasses of cider, and then bought an extra gallon, and at another store bought a large quantity of fireworks. Fitzgerald had a full coil of this rope and the other stores carry about the same kind.

Dr. M. M. Scott testified that he had been a practicing physician for more than twenty years; that he was called to see a body taken out of a tank on December 11th, and after making an examination of the body, found a gunshot wound over the right ear, which penetrated the brain, ranged downward, and lodged against the left temple, a little below the eye. It was made by a 38-caliber bullet. He placed such a bullet in the wound and it fit. The side of the face and head was powder-burned. The wound was mortal and sufficient to produce death. Witness found a small cut or incision in the skin over the right eye. The mouth was bruised, and perhaps a tooth or two gone; a rubbed or skinned place on the right knee; and perhaps one small scratch on the bottom of one foot. "My opinion is that all the wounds except the gunshot were made after death."

I. B. Smith (justice of the peace) testified that he held an inquest over the dead body on December 11th at the tank. Found a gunshot wound about one and one-half inches above and two inches in front of the right ear, in the right temple. The wound ranged downward, and to the front, the ball lodging against the bone of the left temple. Witness ascertained this by probing with a lead pencil. He also testifies to same character of small cuts and bruises as do the other witnesses. There was a rope around the feet of the body, put on by a running noose and then half-hitched over that; but being wet and tightly drawn, was compelled to cut it to get it off. He identifies the rope, and also a rock and wire found on the body of the deceased.

Joel Schrivener testified: On December 4th witness was at deceased's and deceased wanted change for a ten-dollar bill to send to Bangs for

some medicine. Witness suggested that defendant might have the change, but deceased said, "No; John Pearl had no money." Deceased then took his pocketbook and gave Mr. Mills a ten-dollar bill to buy some things at Bangs. He had other bills, but don't know how much. Defendant was present. On Sunday, December 1st or 2nd, defendant had his pistol, a small five-shooter, out cleaning it; a hawk came by and defendant tried to kill the hawk. On December 4th, Mr. Mills, who went to Bangs for deceased, brought him a new lariat rope. Witness left deceased's on the 4th, and has not been back.

R. A. Fitzgerald testified that defendant was in Bangs on December 8th and said he had bought deceased out for $280, and deceased had gone to Germany.

Charles Taylor testified that he knew deceased and defendant. On November 10th, in the presence of defendant, deceased asked witness to buy him five cows and calves and that he had the money to pay for them, exhibiting a roll of bills. Witness told defendant they were worth from $25 to $40. Witnesss does not know how much money deceased had. Defendant looked at witness and winked when the money was exhibited.

Will McIntire stated that about three or four weeks before deceased's death defendant was picking cotton for witness, and told witness that deceased had been to see him about finishing the picking of his cotton and that he wanted to sell him his crop and go back to Germany. "I advised him to see the man who owned the place deceased was working before buying. Defendant said deceased wanted to sell him the present crop and get him and his wife to live with him the next year. Defendant left witness' place that night."

Gus Schultz testified that defendant told him a short time before deceased's death, that deceased wanted to go back to Germany.

Adolph Carms testified that deceased had his cotton ginned where he worked, and on December 6th defendant came to the gin and got a bale of deceased's cotton, saying that deceased had turned it over to him.

Edgar Barnes states that on the 5th of December deceased told him, in defendant's presence, that he (deceased) had five bales of cotton in Brownwood.

Harry Broad testified that on December 11th, the sheriff came in the store and took defendant across the street. After a while defendant returned and witness asked him what was the matter and he said he did not know; it seemed that they thought he had not gotten Ed Tusker's property fairly. Witness asked if he had, and he said yes, and whether he had a bill of sale, and he said yes, he had a writing of some sort at home showing he had bought the property. He looked mad.

E. J. Broad testified the same as Harry Broad, and further stated that defendant said deceased had gone to Germany and would be back in about six months.

M. H. Denman (sheriff) testified: On December 10th he found defendant and asked him what he was doing with deceased's property, and he said he had bought it; he said he was in town in the wagon he had

gotten from deceased, and was working a span of horses he had gotten from deceased; and that deceased had gone to Germany; that he had brought him to Brownwood on December 5th and he had gone from there to Germany. Having told defendant about a similar case, he seemed excited, and said this was not that kind of a case. "About ten days afterwards I found defendant's saddle and it had some mud on it and the mark of a rope about the horn and cantel; the horn of the saddle was severely marked, as if a heavy weight had been dragged by it; it was a new saddle. The side of the saddle was rubbed where a rope would naturally strike it dragging from the horn. I found an old quilt in the yard about ten feet from the back door of deceased's residence. There were two or three blood spots on the quilt and a smear as if something had been dragged off the quilt." Witness found a box of fresh meat in the house; do not know whether the blood on the quilt was human blood or blood of some animal.

Jesse Perry testified he was one of the searching party that went to Clear Creek on the 11th of December to look for deceased. "On the west side of the creek near the tank we noticed a drag or trail coming from the direction of deceased's house and leading into the tank. We traveled the drag back towards the house about 200 yards. The ground was very rocky and rough down the draw over which the drag was made." He also described the finding of the body in the tank and the location of the wounds, etc., as set out by the other witnesses. He also testifies as to finding the track of a small pony along the drag leading towards the tank, and measuring thereof, as well as the shoe on the little brown mare pony one of the Barnes boys was riding, stating they were of the same size and shape. That the pony's foot fitted exactly in the track. He also testifies as to the search of deceased's house and finding of some old clothes there, etc., as heretofore stated.

E. R. Leach testified that defendant on the day before deceased's body was found, told witness he had bought out deceased for $280, and he had gone to Germany.

Jack Cogin testified that he paid defendant for two loads of cotton seed on the 10th day of December,—about $16 or $17.

Hank Wilson corroborates the other witnesses as to eating supper with the Barneses, and afterwards going to Bangs and drinking cider, for which defendant and the other boys paid, as well as a lot of fireworks.

Mrs. Bettie Pearl testified for defendant as to the mental condition of defendant; as to having had spells of despondency for six years, and would cry and moan; and as to insanity in his family, etc. And J. W. Pearl, defendant's father, and Louis Pearl, his brother, also testified as to mental condition and sanity. Various witnesses were introduced, who testified pro and con as to the sanity and insanity of defendant.

Appellant filed his second application for continuance for want of the testimony of witnesses by whom he expected to prove that he was insane. For several of the witnesses, if not all, appellant shows a lack of diligence. Their testimony, however, is cumulative, since the record

before us disclosed that several witnesses testified to the insanity of appellant; and, in the light of the record before us, we do not think the testimony of said witnesses would have been probably true if they had been present and testified as appellant insists they would have done. Appellant also sought to take the deposition of a witness, by whom he expected to prove his insanity, but in his efforts to do this he did not comply with the rules. Johnson v. State, 27 Texas, 758; Ballinger v. State, 11 Texas Crim. App., 323.

In his second bill of exceptions he complains of the following remarks of the State's counsel: "Return a verdict in this case that will be approved by the good citizens of Brown County." The judge, in approving the bill, states that appellant excepted to the remark above quoted, and that he immediately instructed the counsel to keep within the record; that there was no request that he instruct the jury to disregard the same. We do not think the remark was calculated to injure appellant; and, furthermore, no special charge being tendered the court to instruct the jury to disregard the testimony, he can not now be heard to complain. Pennington v. State (Texas Crim. App.), 48 S. W. Rep., 507; Wright v. State, 37 Texas Crim. Rep., 146.

In bill of exceptions number 3 appellant complains of the fact that the court charged the jury that the failure of the defendant to testify in his own behalf should not be used against him. We have held that it is not error for the court to so charge. Fulcher v. State, 28 Texas Crim. App., 465; Unsell v. State, 39 Texas Crim. Rep., 330; Guinn v. State, 39 Texas Crim. Rep., 257.

The last bill of exceptions complains that the court erred in failing to charge on murder in the second degree. We have copied almost in detail the evidence in this case, in order to properly present appellant's contention on this bill. Appellant cites Bennett v. State, 39 Texas Criminal Reports, 650, as supporting his contention. It was there held that, where the evidence of the killing is purely circumstantial, and there is an absence of proof showing the design with which the act was conceived or executed, the law of murder in the second degree should be given in charge. In support of the Bennett case, the court cites Lancaster v. State (Texas Criminal Appeals), 31 Southwestern Reporter, 515, which case appears to be predicated upon Jones v. State, 29 Texas Criminal Appeals, 338. In the last named case the evidence, while circumstantial, shows that appellant had evidently had a struggle with deceased; and there were injuries on the hand of appellant, and other circumstances going to present the issue of murder in the second degree and manslaughter. We do not understand the Jones case intended to lay down the broad proposition, as contended by appellant, that in all cases of circumstantial evidence the court should charge on murder in the second degree. The probative force of circumstantial evidence is often as strong as positive, and the sheer fact that the evidence is circumstantial would not of itself require the trial court to charge on murder in the second degree. If the circumstances are such as to present

the issue of murder in the second degree, then, of course, the court must charge the law applicable to the facts of the case as required by the statute. He must do this if the evidence is positive. There is no legal requirement in one character of evidence that does not exist in the others. Hence we conclude that any expressions in the Bennett and Lancaster cases, supra, indicative of an imperative duty on the part of the trial court to charge murder in the second degree, by sheer force of the fact that the evidence is circumstantial, were not so intended. There are many cases of circumstantial evidence decided by this court holding the very converse of appellant's contention. Among others, we recall Chapman v. State, 34 Texas Criminal Reports, 28, and Thomas v. State, 33 Texas Criminal Reports, 608. In these cases we held that the evidence showed that deliberate, cool design, although circumstantial, evidencing murder in the first degree for the purpose of robbery, and that the same excluded any necessity of a charge on murder in the second degree. So we hold in this case. The evidence not only shows that appellant was sane, but shows a cool, calm, deliberate design to murder deceased for the paltry sum of four or five hundred dollars in property. It shows a fiendish disregard of the instincts of humanity, in that appellant stripped his body entirely of all clothing, tied a rock with a wire around the same, hitched a horse to the body and dragged the same into a tank, and there permitted it to sink with the reavy rock attached. Subsequent to this, appellant is seen to take possession of and sell various articles belonging to deceased, such as his cotton and cotton seed, and persisted in stating that deceased had gone to Germany. Without reviewing all the evidence copied above, we are of opinion that the same does not present the law of murder in the second degree, but absolutely precludes anything except murder in the first degree on the part of appellant. The jury have seen fit to inflict upon him the death penalty, and we do not feel disposed to disturb their finding. The evidence being ample, the judgment is affirmed.

*Affirmed.*

[Note.—Appellant's motion for rehearing overruled without a written opinion.—Reporter.]