CASE 21—INDICTMENT FOR MURDER—FEB. 27.

# Jolly v. Commonwealth.

APPEAL FROM CAMPBELL CIRCUIT COURT.

DEFENDANT CONVICTED OF MURDER AND APPEALS. REVERSED.

HOMICIDE—INSANITY AS DEFENSE—INSTRUCTIONS TO JURY—SUFFI-
CIENCY OF EVIDENCE TO AUTHORIZE MANSLAUGHTER—INSTRUCTION—
DEFINITION OF MALICE.

Held: 1. It was error to instruct the jury that, in order to acquit
accused of murder on the ground of insanity they must be-
lieve that at the time of the shooting he "was laboring
under such a defect of reason as not to know the nature
and quality of the act he was doing, or, if he did know it, that
he did not know it was wrong," as the court should have further
told the jury that they must acquit on that ground if they be-
lieved "that as the result of mental unsoundness he had not
then sufficient will power to govern his actions by reason of
some insane impulse which he could not resist or control."

2. Instead of instructing the jury that if they "entertain a reason-
able doubt as to any facts necessary to constitute defendant's
guilt they must acquit him," it will be better, on another trial,
to instruct them, in the language of Criminal Code Practice,
section 238, that, "if there be a reasonable doubt of the defend-
ant being proven to be guilty, he is entitled to an acquittal."

3. Upon a trial for murder, defendant was not entitled to an instruc-
tion as to manslaughter, where there was no provocation, and
nothing to reduce the crime from murder to manslaughter.

4. Where the death penalty has been imposed, the court can not say,
on appeal, that the substantial rights of accused were not preju-
diced by instructions omitting a material ground of defense.

5. Upon a trial for murder, the court should instruct the jury that
the words "with malice," in their legal sense, denote a wrong-
ful act done intentionally, without just cause, and that by the
term "aforethought" is meant a predetermination to do the act,
however sudden or recently formed in the mind before the act
is done.

CHIEF JUSTICE PAYNTER, DISSENTING.

S. C. BAILEY, FOR APPELLANT.

R. J. BRECKINRIDGE, FOR APPELLEE.

(No briefs in the record.)

Jolly v. Commonwealth.

OPINION OF THE COURT BY JUDGE HOBSON—REVERSING.

Appellant was indicted for the murder of Emma Kle-kamp. The jury to whom the case was submitted found him guilty as charged, and fixed his punishment at death. Judgment was entered upon this verdict. The only grounds of reversal necessary to be noticed relate to the instructions to the jury given and refused by the court on the trial. To understand these properly, we must briefly state the facts shown by the evidence.

The proof showed that appellant, Jolly, was the brother-in-law of the deceased, Emma Klekamp. In July, 1900, Jolly and wife were living at Hamilton, Ohio, keeping house. His mother-in-law, Mrs. Klekamp, and her oldest daughter, Minnie, paid them a visit. Mrs. Jolly came home with Miss Minnie to Newport, where her father lived, bringing with her most of the personal property in the house. Jolly followed them to Newport, and made several unsuccessful attempts to see his wife. He finally secured an interview with her at the office of his attorney, O. W. Root, in which she declined to return to him; the deceased, Emma Klekamp, being present. He was impressed with the idea that his father-in-law and family were keeping his wife from him, and continued his efforts for further interviews, with a view to her return to him, and was greatly disturbed. He stayed at the house of his sister. She testified as follows: "He came to our house on Wednesday morning. I was washing. He says, 'Sister, I am all left alone;' and he said, 'I am going to hunt my wife; I am going to hunt my wife; I am going to hunt her;' and I didn't see him any more until twelve o'clock. I never had him still a moment. He never ate, and he never slept. He done nothing but run and storm. He was off and on, and up and

back again. I said to him, 'John, please be still; after a while, perhaps, this will change.' He would answer, 'I can't do it; I can't do it. I love my wife.' Q. Did you see him the day he shot Emma Klekamp? A. He never got up; he was up all night. Q. Where was he that night? A. He never went to bed, and when I came downstairs I put him in the sitting room, and he looked so wild that I never said any thing to Mr. Hewitson. And I kept all this from my husband, to try to give him a home, and see if he wouldn't be better. In the night he would go out the side screen door, and go right round again, and leave the door open, and every night our house was left open. I would come down the stairs, and tell him he ought not to unlock the doors. 'I didn't do it, sister;' yet I know he did do it. He was the only one that did do it." Several days before the homicide he had asked his attorney, E. H. Kilpatrick, to write to his wife, and try to get an answer in her handwriting. This was after a number of other letters had been written. Kilpatrick testified as follows: "I noticed that Jolly, he would come into my office some days twenty-five times a day, and at night he would come in there and bother me until bedtime, and talk foolishly; and every time he had some new hobby, and I noticed that Jolly was, in my opinion, an unsound man. The day before the tragedy, I wrote up to Mrs. Jolly to please call at the office. If I could see my handwriting, I could identify it; and I got a little bit of a piece of paper about that size, and I read it to Jolly; 'I will not come; I don't want you to bother me.' That was about fifteen minutes after eleven when it came. Mr. Jolly left my office without saying one word. He was an insane man, if ever I seen one. He left without saying one word. He went out, and in about

Jolly v. Commonwealth.

three-quarters of an hour some one said to me: 'Do you
know your client has done an awful thing?  He has killed
his sister-in-law and his wife, and he is now being taken
down to jail in a patrol wagon.'   Q. How long was it, you
say, before Jolly killed his sister-in-law that you saw him
the last time?   A. About a quarter after eleven I got
that note, and in three-quarters of an hour this terrible
thing had been committed.   Q. Was he then in a condition
to distinguish between right and wrong?  A. The man
was diseased, and of unsound mind, and I am satisfied the
man couldn't distinguish the consequences of his act." Af-
ter leaving the lawyer's office at 11:15, Jolly next appear-
ed at the Klekamp residence at 11:40.  When first seen,
he was standing in the kitchen, with a revolver in his
hand, holding it up over his head.  He asked Emma Kle-
kamp for his wife.  She said that his wife was not in.
He said he was going to shoot his wife.  He then reached
for the pantry door.  Emma gave Minnie Klekamp, who
was sitting in the next room, a sign to call for help.  She
ran out and cried murder.  Jolly opened the pantry door.
His wife was in the pantry.  He got her out, and drove
her in the dining room.  Then she got in the pantry again,
and he got her out, and as he did so she fell.  As she was
getting up, he fired on her, shooting her in the back.  She
crawled out of the kitchen on her hands and knees.  He
then seized Emma Klekamp, and drew her face down be-
side him, and putting the pistol close to her face, shot her
through the brain, killing her instantly.  Just then help
came in, and he was disarmed and taken away.  There
was other testimony introduced on behalf of appellant,
corroborating the statements of his sister and attorney
above quoted.  There was also testimony by the Common-

Vol. 110—13

wealth showing that he was not of unsound mind. Mr. Root, who was introduced on his behalf, said he was a mental degenerate.

On this evidence, the court below instructed the jury as follows: "(1) If the jury believe from all the evidence beyond a reasonable doubt that in killing Emma Klekamp, in this county and State, and on the 7th day of August, 1900, the defendant, John W. Jolly, willfully, wrongfully, feloniously, and with malice aforethought, express or implied, shot her with a pistol loaded with a leaden bullet or other hard substance, from which shooting said Emma Klekamp then and there died, they will find him guilty of willful murder, and in their discretion fix his punishment at death or confinement in the penitentiary for and during his natural life; otherwise, they will acquit him. (2) If, however, the jury believe from all the evidence that the defendant, John W. Jolly, on the 7th day of August, 1900, in this county and State, in killing said Emma Klekamp, shot her with a pistol loaded with a leaden bullet or other hard substance, from which shooting said Emma Klekamp did then and there die, but also believe that at the time of said shooting said John W. Jolly was laboring under such a defect of reason not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know it was wrong, they will acquit him on the ground of insanity, and so state in their verdict. (3) If the jury entertain a reasonable doubt as to any facts necessary to constitute defendant's guilt, they must acquit him."

The only defense relied upon for appellant was insanity. It will be observed that the second instruction, which defines the degree of insanity rendering appellant irresponsible criminally for his act, sets it out as such a defect of reason as to disable him from knowing the nature and

quality of the act, or, if he did know it, from knowing that it was wrong. The absence of self-control by reason of unsoundness of mind is entirely omitted. Many insane persons have remarkable intelligence, and are yet truly of unsound mind and wholly irresponsible. In Graham v. Com., 55 Ky., 592, the jury was instructed that "the true test of responsibility is whether the accused had sufficient reason to know right from wrong, and whether or not he had a sufficient power of control to govern his action." In Smith v. Com., 62 Ky., 224, the subject was discussed at length, and this instruction was approved as expressing the true rule. It is true that this case, in so far as it lays down the rule applicable to insanity from voluntary intoxication, was overruled in Shannahan v. Com., 71 Ky., 463, but it has not been otherwise criticized. On the contrary, it is referred to with approval in Kriel v. Com., 68 Ky.,362, where the instruction above quoted was also given and approved in Brown v. Com., 77 Ky., 398. These cases are in accord with the great weight of modern authority, and were recently followed in Abbott v. Com. (Ky.), 55 S. W., 196. In lieu of instruction No. 2 above quoted, the court should have instructed the jury as in instructions "a" and "b" given in that opinion.

The first instruction given by the court is objectionable in its phraseology, and it will be better, on another trial, to give in lieu of it instruction No. 1 asked by the Commonwealth substituting the words, "before the finding of the indictment herein," for the words "on the 7th day of August, 1900," in that instruction.

The third instruction may not have misled the jury; for, taking all the instructions together, they perhaps understood that the facts necessary to constitute appellant's guilt were those set out in the preceding instructions. But

as this court has often said, in instructions on reasonable doubt it is best simply to follow the language of the Code: "If there be a reasonable doubt of the defendant being proven to be guilty, he is entitled to an acquittal." Section 238.

The court properly refused to instruct the jury on the law of involuntary manslaughter. There was absolutely no provocation, and nothing to reduce the crime to manslaughter. It is earnestly argued for the Commonwealth that, in view of the facts of the case, the judgment should be affirmed on the ground that the substantial rights of the appellant were not prejudiced. But in a case where the death penalty has been imposed we do not feel at liberty to say that the substantial rights of the appellant were not prejudiced where the only defense on which he relied was unduly curtailed by the instructions given the jury, and a material ground of defense entirely left out. To hold otherwise, would be for this court to determine his guilt or innocence, and deny him a trial on the merits of his case before a jury of his peers, as provided by the Constitution.

In addition to the instructions we have indicated, the court should, on another trial, instruct the jury that the words "with malice," in their legal sense, denote a wrongful act done intentionally, without just cause, and that by the term "aforethought" is meant a predetermination to do the act, however sudden, or recently formed in the mind, before the act is done. It has been held error to instruct the jury that malice may be implied from certain facts; but it is proper to define the technical terms used in the charge, for without this the jury may be misled by them. There was no error in overruling the demurrer to the indictment,

or in the admission or rejection of evidence. Judgment reversed, and cause remanded for a new trial, and for further proceedings consistent with this opinion.

Chief Justice Paynter dissents.