[Crim. No. 2845. In Bank.—June 24, 1926.]

## THE PEOPLE, Respondent, v. JOSEPH H. WATTS, Appellant.

[1] Criminal Law — Murder — Statements and Conduct of Defendant—Matters for Jury.—In a prosecution for murder, it is for the jury to determine whether the reason assigned by defendant for declining to tell the sheriff at the time of arrest what he knew of the deceased's whereabouts was a subterfuge; or whether, if

---

1.  See 13 Cal. Jur. 664; 8 R. C. L. 225.

genuine, it justified him in withholding from the authorities such information as he possessed; also whether his conduct was contrary to the ordinary behavior of a person charged with crime, and whether it evinced guilt or innocence.

[2] ID.—IDENTITY OF DECEASED—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder it is held that the evidence was sufficient to warrant the jury in finding that a corpse found not far from a place where the one charged to have been murdered was last seen alive, was the body of the latter; and the jury's finding is conclusive upon the court on appeal.

[3] ID. — GUILT OF DEFENDANT — SUFFICIENCY OF EVIDENCE. — In this prosecution for murder it is held that the evidence was sufficient to justify the jury in finding that the defendant was the slayer of the person alleged to have been murdered.

[4] ID. — VENUE — SUFFICIENCY OF EVIDENCE. — In a prosecution for murder, where it was shown that the remains of the person alleged to have been murdered were found at a place many miles from any one of the exterior boundaries of the county in which the prosecution was being conducted, and pools of blood in the immediate vicinity of the body showed that the slaying occurred not far from the spot where the corpse was discovered, the venue was sufficiently proven.

[5] ID. — FIRST DEGREE MURDER — SUFFICIENCY OF EVIDENCE. — In this prosecution for murder it is held that the evidence was sufficient to warrant the jury in finding the homicide to be murder in the first degree.

[6] ID.—EVIDENCE—STRANDS OF HAIR—OPINION OF WITNESS.—In a prosecution for murder, there was no error in permitting the deputy coroner, who was present when strands of hair were found near the body of the deceased, to testify that in his opinion the hair was that of a human being, in the absence of a proper objection to the evidence.

[7] ID.—EVIDENCE—MAPS.—In a prosecution for murder, there was no error in admitting in evidence a map of the county in which the case was being prosecuted, for use in connection with testimony of certain witnesses, for the purpose of representing the relative location of the places testified to by them, said map being a public document, part of the files in the office of the county surveyor.

[8] ID.—COURSE OF TRAVEL OF DECEASED—TELEGRAMS.—In a prosecution for murder there was no error in admitting in evidence telegrams tending to show the course of travel of the deceased across the continent toward the place where he was last seen alive.

2. See 8 Cal. Jur. 582.
7. See 13 Cal. Jur. 710; 10 R. C. L. 1152.

[9] ID.—OBJECTIONS TO EVIDENCE—APPEAL.—Where the trial court has overruled a general objection to the admission of evidence, i. e., an objection that it is incompetent, irrelevant and immaterial, the party against whom the ruling was made will not be permitted to urge in the appellate court a particular objection which could have been readily cured had it been openly urged in the trial court.

[10] ID.—EVIDENCE—LACK OF FOUNDATION—OBJECTION.—A general objection to offered testimony that it is irrelevant and incompetent is not sufficient if the real ground of the objection is that no proper foundation has been laid for its introduction.

[11] ID. — CROSS-EXAMINATION — IMPROPER RESTRICTION — LACK OF PREJUDICE.—In this prosecution for murder it is held that there was an improper restriction upon the right of cross-examination of a certain witness, but that from a survey of the entire record it appears that the error did not result in a miscarriage of justice, and that it is a case for the application of section 4½ of article VI of the constitution.

[12] ID.—SECTION 4½, ARTICLE VI, CONSTITUTION—INJURY NOT PRESUMED FROM ERROR.—Since the adoption of section 4½ of article VI of the constitution, it is no longer the rule in this state that injury is presumed from error; and before the reversal of a judgment of conviction in a criminal case may be had, it must affirmatively appear to the satisfaction of the court on appeal, after an examination of the entire cause, including the evidence, that the accused may well have been substantially injured by the error of which he complains.

[13] ID.—CONVICTION OF MURDER OF FIRST DEGREE OR ACQUITTAL—INSTRUCTION—CONSTITUTIONAL LAW.—In a prosecution for murder, if the evidence is of such a nature as to warrant only a verdict of first degree, in the event that the accused is guilty at all, there is no error in instructing the jury in effect that they should either find the defendant guilty of murder in the first degree or acquit him of any offense whatever; and such a rule does no violence to the constitutional inhibition against charging juries with respect to matters of fact.

[14] ID.—CHARGE AS TO LOWER DEGREES OF CRIME.—The rule that the court need not charge with respect to a lower degree of murder or an included offense, where there is no evidence tending to show the commission of a lesser crime than murder in the first degree, is not confined to those specific homicidal acts particularly enumerated in the code definition of murder in the first degree, and which carry with them conclusive evidence of deliberation and

---

9. See 8 Cal. Jur. 242.

11. See 8 Cal. Jur 601; 2 R. C. L. 233.

13. See 13 Cal. Jur. 666.

premeditation; nor is such rule confined to those cases where the evidence of the slaying is direct and positive.

[15] ID.—SUFFICIENCY OF EVIDENCE TO WARRANT INSTRUCTION.—In this prosecution for murder it is held that an instruction limiting the jury to a verdict finding the accused guilty of the highest offense or not guilty of any crime whatever, was fully warranted by the facts disclosed by the evidence.

[16] ID.—CIRCUMSTANTIAL EVIDENCE—INSTRUCTIONS.—In this prosecution for murder it is held that the court did not erroneously instruct the jury upon the weight of circumstantial evidence, and the statement in such instructions that, "There is nothing in the nature of circumstantial evidence that renders it any less reliable than any other class of evidence," while more in the nature of an argument than a declaration of law, and, therefore, should have been omitted, was not prejudicially erroneous.

[17] ID.—FLIGHT—KNOWLEDGE OF CHARGE OF CRIME—INSTRUCTIONS.—In a prosecution for murder, an instruction upon the subject of "flight" which fails to admonish the jury that the defendant must have known that a crime had been perpetrated and that he was accused of its commission, should not be given; but the defendant was not substantially injured by the giving of the same where no other inference could reasonably be drawn from the evidence than that the defendant knew the crime had been perpetrated and that he would be charged with its commission.

[18] ID. — PROBATIVE FACTS — INSTRUCTIONS. — In this prosecution for murder it is held that the instructions did not charge the jury that they could take into consideration only such probative facts as were established beyond a reasonable doubt.

[19] ID.—PROOF OF IDENTITY OF DECEASED AND CAUSE OF DEATH—INSTRUCTIONS.—In this prosecution for murder it is held that there is no merit in the claim that the court charged the jury that a particular fact or group of facts afforded sufficient proof of the identity of the deceased, cause of death, etc.

[20] ID.—FIRST DEGREE MURDER WITHOUT DELIBERATION AND PREMEDITATION—INSTRUCTIONS.—In this prosecution for murder it is held there is no basis for the claim that the trial court charged that defendant could be found guilty of murder in the first degree without including in the charge the essential elements of deliberation and premeditation.

[21] ID.—DELIBERATION AND PREMEDITATION—MALICE AFORETHOUGHT.—The words "malice aforethought" in an indictment for murder are equivalent to an averment that the killing was committed with deliberation and premeditation.

16.    See 8 **Cal. Jur.** 369.
17.    See 8 **Cal. Jur.** 346.
21.    See 13 **Cal. Jur.** 659.

[22] ID.—INSTRUCTIONS—CONSTRUCTION OF.—Where all the instructions read and considered together as one charge, without straining the language, show a fair, harmonious and correct statement of the law applicable to the facts of the case, and contain all the conditions and limitations which are omitted from isolated excerpts selected for criticism, this obviates objections to particular portions of the instructions taken alone.

(1) 30 C. J., p. 322, n. 62.   (2) 30 C. J., p. 288, n. 90.   (3) 30 C. J., p. 296, n. 19.   (4) 30 C. J., p. 290, n. 17.   (5) 30 C. J., p. 312, n. 42   (6) 17 C. J., p. 56, n. 16.   (7) 16 C. J., p. 745, n. 21.   (8) 16 C. J., p. 743, n. 66.   (9) 17 C. J., p. 71, n. 44.   (10) 17 C. J., p. 68, n. 34.   (11) 17 C. J., p. 368, n. 5.   (12) 17 C. J., p. 274, n. 22. (13) 30 C. J., p. 402, n. 77.   (14) 30 C. J., p. 398, n. 39.   (15) 30 C. J., p. 397, n. 30.   (16) 16 C. J., p. 944, n. 2.   (17) 16 C. J., p. 985, n. 48.   (18) 16 C. J., p. 1047, n. 65.   (19) 16 C. J., p. 943, n. 86.   (20) 30 C. J., p. 348, n. 2.   (21) 30 C. J., p. 114, n. 89. (22) 16 C. J., p. 1050, n. 84.

APPEAL from a judgment of the Superior Court of San Bernardino County and from an order denying a new trial. Charles L. Allison, Judge. Affirmed.

The facts are stated in the opinion of the court.

Perky, McConnell & Hill, Russell A. McKinley and Swing & Wilson for Appellant.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, and George H. Johnson, District Attorney, for Respondent.

Frazier & Averitte, *Amici Curiae*, for Appellant.

FINLAYSON, J., *pro tem.*—Defendant was charged with the murder of Wilfred Hey, alleged to have been committed in San Bernardino County on or about November 26, 1924. He was convicted of murder in the first degree and was sentenced to suffer the extreme penalty. The appeal is from the judgment and from an order denying him a new trial.

In the latter part of December, 1924, a body, that of a man who had been dead for some time, was found at a

22.   See 8 Cal. Jur. 631.

lonely spot on the desert in San Bernardino County. By its verdict the jury impliedly found that the body was that of Wilfred Hey; that he had been murdered; that defendant was the slayer; and that the homicide was murder in the first degree. No eye-witness to the tragedy came forward, the evidence being entirely circumstantial. Defendant did not take the witness-stand nor did any witness testify in his behalf. In addition to claiming that the trial court erred in the admission and exclusion of certain evidence and in the giving of certain instructions, appellant contends that the evidence was insufficient to identify the dead body as that of Wilfred Hey, to identify defendant as the slayer, to prove the venue as laid—i. e., that the crime was committed in San Bernardino County—or to show that the homicide was murder in the first degree.

The uncontradicted evidence for the People tended to establish a circumstantial case against the accused the outstanding features of which are substantially these: Wilfred Hey was a young man having the appearance and speech of an Englishman. He was about twenty-eight years of age, was approximately five feet four inches tall, weighed about one hundred and twenty-five pounds and had brown or reddish-brown hair. He had lived at the Kalamazoo Apartments in Detroit, Michigan, from July, 1924, to the latter part of the month of October following, when he left that city in company with defendant in defendant's automobile—a second-hand Overland touring car. Defendant had lived with Hey in the latter's apartment for some three or four weeks previous to their departure from Detroit. Through this association it may be inferred that he had an opportunity to acquire some knowledge of Hey's financial affairs. About two months before the two men left Detroit Hey called upon the assistant manager of the Peoples State Bank at that city and asked that the bank write to England regarding the sale of some British war bonds which he owned and which he desired to sell. The bonds, which were then with the Union Bank of Manchester, England, were worth about $1,500. In furtherance of Hey's wishes a letter, signed by him, was sent by the Peoples State Bank to its foreign correspondents requesting them to sell the bonds and to transfer the proceeds to the bank at Detroit.

Later, and while Hey still was in Detroit, the Peoples State Bank sold for him, through a New York institution, some shares of stock upon which a small sum of money was realized. The proceeds of this sale were received by the Detroit bank on October 22, 1924. From the sum realized by the sale the bank, after deducting a few dollars to liquidate a small loan which it previously had made to Hey, placed $100 to his credit in a savings account and delivered the balance to him. Shortly thereafter defendant and Hey left Detroit to motor to Los Angeles. Up to that time the Detroit bank had not succeeded in selling the British war bonds.

Hey was not again heard of until November 7, 1924, when the Detroit bank received a telegram, purporting to have been sent by a bank at Rock Springs, Wyoming, inquiring if a check drawn on Hey for ten dollars was good. On November 10, 1924, the Detroit bank received another telegram, purporting to have been sent by Hey from Ogden, Utah, asking that the balance of his savings account be transmitted to the Security State Bank at Ogden. On the next day the Detroit bank transmitted the money to the Ogden bank by telegram.

On the same day that the Detroit bank received Hey's telegram from Ogden, the president of the Security State Bank at the latter city prepared and delivered to Hey the form of a telegram to the Detroit bank. This document was admitted in evidence as People's exhibit 2. There was written on it the following, in the handwriting of the president of the Ogden bank: "Peoples State Bank, Detroit, Michigan. Telegraph Security State Bank, Ogden, Utah, balance of my savings account. Waive identification. Will write you regarding sale of British war bonds and transfer of money when I reach my destination." This paper was found on the clothing of the body discovered on the desert in San Bernardino County. It is a fair inference from the evidence that Hey kept the document, though he doubtless used it as a model from which to compose the telegram which he sent to the Detroit bank; for on the day that he received this bit of writing from the president of the Ogden bank he and defendant called at the office of the Western Union Telegraph Company at Ogden and there caused to

be sent to the Detroit bank a message which was almost identical with the form which had been prepared by the Ogden banker.

Defendant and Hey arrived in Ogden about November 8, 1924. There they remained for about one week. Their automobile was in need of some repair when they reached that city, but neither had any money for that purpose. Indeed, they came to Ogden "stranded," and had not the wherewithal to buy their meals or to pay for lodgings. Defendant borrowed a small sum from a garageman at Ogden with whom he had left his car for needed repairs. The money which the Detroit bank remitted to the Ogden bank in response to Hey's telegram of November 10th was paid to Hey on November 15, 1924. Upon that occasion defendant accompanied Hey to the bank. Upon the payment of the money to Hey, defendant said: "Now that we can get out of town, we better go." At the same time defendant told the cashier that they had come from Detroit, that they were going to Los Angeles and that they were traveling in an Overland automobile. On the preceding day defendant had called at the Security State Bank unaccompanied by Hey, and had then asked the cashier if the money had come from Detroit for Wilfred Hey, telling the bank officer that they had run out of money, that they were out of money when in Rock Springs, Wyoming, that they had to send for money while there and that they had received ten dollars, which paid their expenses to Ogden; adding that "the damned fool [referring to Hey] didn't know anything; that he only drew ten dollars when he ought to have drawn it all." Before the bank at Ogden paid Hey the money which the Detroit bank had remitted, the cashier asked him if he had anything that would indicate that he was Wilfred Hey. Whereupon the British war bonds were mentioned—defendant being present at the time. Hey, in defendant's presence, then produced a memorandum which had been given to him by the bank at Detroit and which referred to the authority that he had given that bank to sell the war bonds and to credit his account with the proceeds.

We next hear of defendant and Hey at Silver Lake, where the twain were seen together on the evening of No-

vemeber 25, 1924. Silver Lake is a small settlement in San Bernardino County, located many miles from any one of the county's exterior boundary lines. At that village, between 6 and 7 o'clock on the evening of November 25th, defendant procured some gasoline from B. Harrod, a mining man who was stopping at the village temporarily. Defendant and Harrod walked two blocks to the spot where defendant's car was parked, conversing as they walked. Defendant told Harrod that he was driving from Salt Lake City and was headed for Los Angeles. At the trial Harrod described the automobile as an Overland touring car. Sitting in the front seat of the car, when Harrod and defendant reached the vehicle, was a man whom Harrod, when testifying as a witness in the case, identified as Hey from some photographs which were shown him by the district attorney. Harrod described Hey as a "sandy-complected" man who wore a dark suit of clothes and who had a light cap on his head. This is the last time Hey was seen alive.

About a month later, at a spot about twenty-nine miles south or southwesterly from Silver Lake and in the heart of San Bernardino County, the body referred to in the early part of this opinion was found. It was that of a man approximately five feet four inches tall, weighing from 125 to 130 pounds. It lay on the surface of the ground about 92 feet south of a county road, in a region where the road passes through a dry wash 300 feet wide. The place of the gruesome find is several miles from any human habitation, in wild, desert country. The corpse was covered with canvas which had been weighted down with rocks. The body was fully dressed, save that there was no collar, tie, hat or cap on it. The trousers and coat were of a dark blue texture, with fine white stripes. Between the body and the county road were two small bushes. The corpse lay just beyond these bushes and behind a small rise in the bank of the wash. When found, the body was in an advanced stage of decomposition. Wild animals had so stripped the skull of flesh that there were no recognizable features. The skull was as white as a sheet of paper. The vertebrae from the collar-bone up were exposed. On the top of the skull was an irregular, depressed fracture, triangular in shape, about an inch and a half long and three-quarters of an inch across. There was another large open-

ing in the skull back of the left ear, in the occipital bone. This latter opening was large enough to permit the tips of four fingers to be inserted an inch or two. It extended in an oblique direction from above downward and backward from the ear, and was about an inch wide in its widest part and approximately three inches in length. In both instances the fractured portions of the skull were caved in. The superintendent of the county hospital, a regularly licensed and practicing physician, after describing the nature of the wounds, testified that he did not think that either one could have been self-inflicted. Each wound had the appearance of having been caused by the crushing blow of a heavy, blunt instrument, an inch or so in diameter and hard enough to break the skull.

Extending from the edge of the road to the spot where the body was found was a track or depression in the desert sand, about eighteen inches in width, which looked as though a human body had been dragged over it. In this track, five feet from the road, was a blood-soaked spot on the sand, about six inches in diameter. The evidence discloses that the blood was that of a human being. Seventeen feet farther, in the direction toward which the body lay, was another spot where the sand was soaked with human blood. Scattered about the body were bunches of hair of a reddish-brown color. The deputy coroner of San Bernardino County, who was present when the body was found, testified that in his opinion the hair was that of a human being.

On the clothing of the deceased, in the watch pocket, were found two ferry tickets, issued by the Detroit and Windsor Ferry Company, entitling the holder to passage by ferry between the city of Detroit and the near-by town of Windsor. There was also found in the same pocket three small slips of paper and the telegraphic form which the president of the Security State Bank at Ogden had delivered to Hey on the 10th of November, and which, as we have stated, was introduced in evidence as People's exhibit No. 2.

Coming now to defendant's actions subsequent to the time when he and Wilfred Hey were at Silver Lake on the evening of the 25th of November: Defendant arrived in Los Angeles in the latter part of that month. He told his

198 Cal.—50

brother, who resided in that city, that he had come from the east in his four-passenger touring car. On December 1, 1924, defendant, accompanied by his brother, visited the Bank of Italy in Los Angeles, and, representing himself to be Wilfred Hey, asked the person in charge of the telegraphic transfer department of that institution if there was any money there for him. It seems that prior to that date the Bank of Italy had received telegraph instructions from the Peoples State Bank of Detroit to pay to Wilfred Hey a certain sum of money—the proceeds of the sale of the British war bonds. This money had been received by the Detroit bank in the interim, and that institution had undertaken to remit it to the Bank of Italy at Los Angeles. The employee of the Bank of Italy with whom defendant had his dealings asked defendant to produce some evidence of his identity as Wilfred Hey. Thereupon defendant's brother, who was a customer of the bank, spoke up and told the banker that defendant was Wilfred Hey. The bank then issued to defendant, in the name of Wilfred Hey, a teller's exchange for the amount which it had been authorized to pay to Hey. Defendant, under the fictitious name of Wilfred Hey, then opened an account with the Bank of Italy. Later he drew out the money which he had deposited. We next hear of him in San Francisco, where he was taken into custody by the sheriff of San Bernardino County on February 7, 1925. The sheriff told defendant that he was charged with the murder of Wilfred Hey. Defendant admitted that he knew Hey, but upon being asked by the sheriff when it was that he last saw the man who had journeyed with him almost across the continent, he refused to tell, offering as an excuse for his reticence that he knew of a case where an accused had talked when placed under arrest and was "jobbed and convicted." **[1]** We pause here to say that it was for the jury to determine whether the reason assigned by defendant for declining to tell the sheriff what he knew of Hey's whereabouts was a subterfuge, or whether, if genuine, it justified him in withholding from the authorities such information as he possessed; also whether his conduct was contrary to the ordinary behavior of a person charged with crime, and whether it evinced guilt or innocence. (*People* v. *Dole,* 122 Cal. 487 [68 Am. St. Rep. 50, 55 Pac. 581]; *People* v. *Amaya,* 134 Cal. 531

[66 Pac. 794]; *People* v. *Swaile,* 12 Cal. App. 192, 198 [107 Pac. 134]; *People* v. *Graney,* 48 Cal. App. 773 [192 Pac. 460]; *Jackson* v. *State,* 167 Ala. 77 [52 South. 730]; *State* v. *Magoon,* 68 Vt. 289 [35 Atl. 310].)

With this synoptical statement of the most important and controlling facts and circumstances shown by the People and upon which a conviction was sought, we proceed to a consideration of appellant's points in the order of their presentation.

[2] The evidence was sufficient to warrant the jury in finding that the body was that of Wilfred Hey. The fact that the corpse was found at a spot not more than an hour's ride by automobile from the place where Hey was last seen alive, the fact that the body was that of a man of about the same size and weight as Hey, having the same colored hair and clothed with outer garments of substantially the same general color as those worn by Hey when he was seen at Silver Lake, and that there was found in one of the pockets a ferry ticket entitling the holder to passage between Windsor and Detroit—the city where Hey had lived for some three or four months before embarking upon his fatal adventure—are pregnant circumstances, to say the least. It may be that they alone would not suffice to justify the jury in finding that the body was that of Wilfred Hey. But when to these circumstances we add the further fact that there was found in the vest pocket of the deceased the form of telegram which the president of the Security State Bank at Ogden had made out and delivered to Hey but a few weeks previously, the conclusion that the body was that of Wilfred Hey becomes well-nigh irresistible. But this is not all. In addition to these damning circumstances we have appellant's incriminating conduct after the disappearance of his traveling companion. His brazen effrontery in boldly representing himself as Wilfred Hey when he secured from the Bank of Italy the proceeds of the British war bonds clearly indicates an utter absence of that fear of detection which he must have felt did he not know that the body of the man he was impersonating lay rotting on the desert sands. In the light of these circumstances the determination of the jury is conclusive upon this court. (*People* v. *Peete,* 54 Cal. App. 333, 347 [202 Pac. 51]; *State* v. *Barnes,* 47 Or. 592 [7 L. R. A. (N. S.)

181, 85 Pac. 998]; *State* v. *Sprouse* (Mo.), 177 S. W. 338; *State* v. *Barrington,* 198 Mo. 23 [95 S. W. 235]; *Ausmus* v. *People,* 47 Colo. 167 [19 Ann. Cas. 491, 107 Pac. 204].)

[3]   There was sufficient evidence to justify the jury in finding that appellant was the slayer of Hey.   He had been the dead man's traveling companion while the two were making their way across the continent with Los Angeles as their goal.   He was the one who last was seen with the slain man at a small settlement not many miles from the spot on the vast stretch of uninhabited desert where the body was found.   He had a mercenary and sordid motive for the commission of the crime, i. e., a desire to possess himself of the money to which his murdered companion was entitled.   This motive was later exhibited by his false representation to the employees of the bank at Los Angeles that he was Wilfred Hey and that as such he was entitled to the proceeds from the sale of Hey's British war bonds. The confident assurance with which appellant enacted the impostor's role when posing as Wilfred Hey is explicable upon the theory that he was fully aware that the man whose name and character he was assuming could not rise up in any human tribunal and there call him to account for the money gained through his treachery and deceit.   And then there is appellant's flat refusal to tell the sheriff when it was that he last saw the deceased.   If appellant did not slay Hey he must have known who it was that did the deed; for it is a fair inference from all the circumstances in the case that he was with his companion when the latter was felled by the death-dealing blows.   It does not seem reasonable, therefore, that appellant, if he were innocent, would have refused to tell what he knew of the whereabouts of his slain companion.   The withholding of information, directly invited, upon a subject of such grave import and which so vitally concerned the welfare of the person with whom he had been so closely associated, is a circumstance which betokens that fear of self-betrayal which grips the heart of one who knows himself as a bloodstained murderer.   Who, if not appellant, was the person who so carefully covered the body with canvas and secreted it behind the bushes ninety-two feet from the highway?   He was the person who last was seen with the unfortunate victim of the murderous assault, and he must have had some knowledge of what had befallen the man

who for so long a time had been his boon companion.

The circumstances which we have recited point so directly to appellant as the guilty agent who was responsible for Hey's untimely taking off that we do not hesitate to hold the evidence sufficient to justify the verdict. It of course is possible that appellant did not murder Hey. But as was said in *Ausmus* v. *People, supra,* " . . . until the faculties of man are unfolded and expanded so that all things are known, we must act on circumstances as they appear, logical deductions made and presumptive proof, or leave the worst crimes unpunished."

[4] The venue was proved as laid. The remains were found at a place which is many miles from any one of the exterior boundaries of San Bernardino County. The pools of blood in the immediate vicinity of the body show that the slaying occurred not far from the spot where the corpse was discovered.

[5] The evidence was sufficient to warrant the jury in finding the homicide to be murder in the first degree. The circumstances all indicate that the deceased was wilfully and brutally slain for his money. There was no evidence of a combat or of a struggle. No circumstances of mitigation, justification, or excuse were shown. Two crushing blows on the head with a deadly weapon—some blunt instrument sufficiently hard and heavy to produce such lethal wounds—had evidently ended the life of Wilfred Hey. From the character of the weapon used, the nature of the wounds inflicted and the acts and conduct of appellant subsequent to the slaying, the jury had the right to infer that it was wilful murder, done with the fell purpose of acquiring the proceeds of the dead man's British war bonds by subsequently resorting to that form of deception which appellant later did practice upon the bank in Los Angeles. So inferring, the jury was warranted in returning a verdict of murder in the first degree. (*People* v. *Mahatch,* 148 Cal. 200, 203 [82 Pac. 779]; *People* v. *Machuca,* 158 Cal. 62 [109 Pac. 886]; *People* v. *Bellon,* 180 Cal. 706 [182 Pac. 420]; *People* v. *Erno,* 195 Cal. 272 [232 Pac. 710]; *People* v. *Peete, supra; Killer* v. *Commonwealth,* 124 Pa. St. 92 [16 Atl. 495]; *Commonwealth* v. *Drum,* 58 Pa. 9; *State* v. *Welch,* 36 W. Va. 690 [15 S. E. 419].)

[6] No error was committed in permitting the deputy coroner, who was present when the strands of hair were

found near the body of the deceased, to testify that in his opinion the hair was that of a human being. The district attorney asked the witness this question: "Could you tell whether or not it was human hair you saw there?" Defendant's counsel objected to the question upon the ground that it called for the opinion of one not shown to be an expert. The question was not answered. It seems that the district attorney, when arguing against the validity of the objection, stated to the court, in substance and effect, that his question did not call for the opinion of the witness but that it merely asked him whether he was able to say that the hair was or was not from the head of a human being; and then, without waiting for the witness to give an answer, the prosecutor propounded another question as follows: "Do you know whether that was human hair?" To this question no objection was interposed. The witness answered by saying, in substance and effect, that he did know whether it was human hair. Then, in response to another question put to him by the district attorney, he testified that the hair which he saw was human hair. The two questions which preceded the one last mentioned had been propounded for the purpose of ascertaining whether the witness possessed that knowledge which would qualify him to testify as an expert to the character of the hair. The objection that he was not shown to be qualified should have been interposed to the last question—the one which asked him whether it was human hair. The preceding questions were of a preliminary character, and the only one to which objection was made went unanswered.

[7] There was no error in admitting in evidence a map of San Bernardino County. It was used in connection with the testimony of certain witnesses for the purpose of representing the relative location of the places testified to by them. It is proper for courts to admit in evidence illustrative charts and maps. (*Foley* v. *Northern California etc. Co.*, 165 Cal. 107 [130 Pac. 1183]; 22 C. J. 910.) The map was a public document. It was a part of the files in the office of the county surveyor. A published map, made by persons indifferent between the parties, is *prima facie* evidence of fact of general notoriety and interest. (Sec. 1936, Code Civ. Proc.)

[8] No error was committed in admitting exhibits 17, 18, and 20 in evidence. Exhibit 17 was the telegram from

the Rock Springs bank to the Detroit bank, sent from Rock Springs, Wyoming, on November 7, 1924. It reads: "Is check on Wilfred Hey for ten dollars good." Exhibit 18 is a copy of the telegram which the Detroit bank sent in reply to the telegraphic inquiry of the Rock Springs bank. The original of this reply was not in California at the time of the trial. Exhibit 20 was the telegram sent by Hey to the Detroit bank from Ogden on November 10, 1924. It reads: "Telegraph Security State Bank Ogden Utah balance in my account. Waive identification. Wilfred Hey." The only grounds of objection made in the lower court were these: Exhibit 17 was objected to on the ground that it was incompetent and irrelevant; exhibit 18 on the ground that it was incompetent; and in presenting his objection to exhibit 20 defendant's counsel merely said: "Same objection, your honor, as to the other telegram." None of these documents was objectionable upon the ground of irrelevancy. Any competent evidence which tended to show that Hey was journeying westward from Detroit toward the place where he was last seen alive was relevant and material. These telegrams, showing as they do that Hey was in Rock Springs on November 7th and that three days later he was in Ogden, tended to substantiate the theory that at the times when they were sent he was on his way from Detroit to the western side of the continent— that he was journeying in a direction which would bring him to the place where the dead body was found. Nor was the other ground of objection—incompetency—sufficient reason for the exclusion of these exhibits. In support of this objection it is claimed here that no foundation was laid for the introduction of the telegrams. [9] It is well established that where the trial court has overruled a general objection to the admission of evidence, i. e., an objection that it is incompetent, irrelevant and immaterial, the party against whom the ruling was made will not be permitted to urge in the appellate court a particular objection which could have been readily cured had it been openly urged in the trial court. (*People* v. *Louie Foo,* 112 Cal. 17, 22 [44 Pac. 453]; *People* v. *Baird,* 105 Cal. 126 [38 Pac. 633].) [10] In *People* v. *Frank,* 28 Cal. 507, this court held that a general objection to offered testimony that it is irrelevant and incompetent is not sufficient if the

real ground of the objection is that no proper foundation has been laid for its introduction.

[11] The curtailment of defendant's cross-examination of the witness Harrod is not reversible error. It will be recalled that this witness testified that he saw defendant at Silver Lake on the evening of November 25, 1924. This was on his direct examination. On cross-examination Harrod testified that he did not see defendant again until March or April of 1925, when he saw him in a cell in the county jail at San Bernardino; that when he saw defendant in his cell he recognized him, and that no one pointed him out. The witness was then asked this question by defendant's counsel: "Will you state that you did not testify at the preliminary hearing that you went up in the cell and a man said 'There he is,' and you turned around at this preliminary hearing and pointed out Fred Weaver as the man that pointed out Watts to you?" The court sustained an objection to the question upon the ground that it was not the proper way to impeach the witness. Impeachment was not necessarily the purpose of the question. Only as the witness answered might questions by way of direct impeachment have followed. The ruling was an improper restriction upon the right of cross-examination. (*People v. Jones*, 160 Cal. 358, 365 [117 Pac. 176]; *People v. Hart*, 153 Cal. 261, 266 [94 Pac. 1042].) However, a survey of the entire record compels the conclusion that the error has not resulted in a miscarriage of justice, and that it is a case for the application of section 4½ of article VI of the constitution. Even if the question had been permitted and the witness had given it an affirmative answer, it is inconceivable that the jury could have rejected as incredible Harrod's positive testimony that he saw the defendant and Hey at Silver Lake. Harrod's testimony, like that of all the other witnesses for the prosecution, was not contradicted in any particular whatever. If, after having had his memory refreshed by the question asked of him on cross-examination, Harrod had admitted that at the preliminary examination he did testify that defendant was pointed out to him when he saw the latter in his cell, that fact would not necessarily have been inconsistent with the witness' testimony that he recognized defendant when he saw him in the cell. Had witnesses on behalf of the defendant been produced, and had they given testimony contradicting Har-

rod's testimony that he saw defendant with Hey at Silver Lake, an affirmative answer by Harrod to the question ruled out by the trial court might possibly have had sufficient weight to tip the scales in favor of the testimony of such opposing witnesses. But in the absence of any such contradictory testimony we do not perceive how appellant could possibly have been prejudiced by the court's ruling. [12] Since the adoption of section 4½ it no longer is the rule in this state that injury is presumed from error. Before the reversal of a judgment of conviction may be had it must affirmatively appear to the satisfaction of this court, after an examination of the entire cause, including the evidence, that the accused may well have been substantially injured by the error of which he complains. (*People* v. *Lapara,* 181 Cal. 66, 72 [183 Pac. 545] ; *People* v. *Mazzurco,* 49 Cal. App. 275, 280 [193 Pac. 164].) No such injury appears here.

[13] The court did not err in giving an instruction which, in effect, told the jurors that they should either find defendant guilty of murder in the first degree or acquit him of any offense whatever. After having carefully defined the crime of murder and each of the two degrees thereof, as well as manslaughter, and after having fully instructed the jury as to the essential elements of each of those offenses, the learned trial judge gave an instruction to the effect that the only degree of murder for the jurors to consider was murder in the first degree, and that they were not to consider any other degree of murder or manslaughter in their deliberations. In consonance with this instruction but three forms of verdict were handed to the jury, viz.: murder in the first degree, murder in the first degree with the penalty of life imprisonment, and not guilty. Under the circumstances disclosed by all the evidence, the giving of the instruction was not error.

In a criminal case instructions are always to be given with reference to the facts proved before the jury. Accordingly, it is the established rule that on the trial of a person charged with murder it is proper to refuse to give an instruction as to a lesser degree than that of murder in the first degree, or as to a lesser offense included within the crime charged, if the evidence is of such a nature as to warrant only a verdict of first degree murder, in the event that the accused is guilty at all. (*People* v. *Rogers,* 163 Cal.

476, 482, 483 [126 Pac. 143]; *People* v. *Lapara, supra;
People* v. *Byrnes,* 30 Cal. 206; note to *Bandy* v. *State,*
21 A. L. R. 603 et seq.) This rule does no violence to the
constitutional inhibition against charging juries with respect
to matters of fact. (*People* v. *Welch,* 49 Cal. 174, 181.
See, also, *State* v. *Hopper,* 71 Mo. 431.)

In the cases cited by appellant (*People* v. *Valencia,* 43
Cal. 552, *People* v. *Ah Lee,* 60 Cal. 85, and *People* v. *Chew
Sing Wing,* 88 Cal. 268 [25 Pac. 1099]), the jury in effect
was instructed that from the mere *killing* of the deceased
the law presumes murder in the first degree. (See *People*
v. *Bawden,* 90 Cal. 197 [27 Pac. 204].) Such an instruc-
tion obviously is erroneous, since it omits from the defini-
tion of murder in the first degree the essential elements
of deliberation and premeditation. It is, of course, the
peculiar province of the jury to say in each and every case
whether the killing was perpetrated with that deliberation
and premeditation which are necessary to constitute it
murder of the first degree. There was no interference
with that prerogative in the present case. Here the jurors
were carefully and correctly advised by the court's instruc-
tions as to what constitutes murder in the first degree,
and were told, in substance and effect, that to justify a
verdict of guilty every essential element of the crime must
be established beyond a reasonable doubt.

[14] The rule that the court need not charge with re-
spect to a lower degree of murder or an included offense,
where there is no evidence tending to show the commission
of a lesser crime than murder in the first degree, is not
confined to those specific homicidal acts particularly enu-
merated by the legislature in its code definition of murder
in the first degree, and which carry with them conclusive
evidence of deliberation and premeditation. That is to say,
the rule is not limited to cases where the killing was
perpetrated by means of poison, lying in wait, etc., or where
the slaying was committed in the perpetration or attempt
to perpetrate some one of the felonies enumerated in the
statute, such as robbery, arson, etc. On the contrary, it
extends to all cases where there is no evidence tending to
show the commission of a lesser offense than murder in the
first degree. In *People* v. *Lapara, supra,* this court sanc-
tioned the application of the rule to a case where the
deceased was shot while driving a truck, and enmity was

the apparent motive for the slaying. It may be, as is stated in substance by the Ohio court in *Bandy* v. *State, supra* (102 Ohio St. 384 [21 A. L. R. 594, 131 N. E. 499]), that a refusal to charge upon the lesser degree should be the exception in those cases where the killing is not of the kind which the legislature has taken upon itself the responsibility of saying shall be murder in the first degree, and that, conversely, the giving of a charge upon the lesser degree ordinarily would be the exception in those cases where the killing is of the kind which the legislature has declared shall conclusively evidence deliberation and premeditation. But however this may be, we are satisfied that the rule is applicable to every case where there is no evidence tending to show the commission of a lesser offense than that of murder in the first degree.

Nor is the rule confined to those cases where the evidence of the slaying is direct and positive. The mere fact that the evidence is circumstantial would not of itself require the trial court to charge on murder in the second degree. There are many cases which hold that though there be no eye-witness to the killing and the evidence is entirely circumstantial, no instruction upon a lesser offense than that of murder in the first degree need be given where the circumstances disclosed by the evidence will not permit a reasonable inference that the defendant was guilty of a lesser grade of homicide. (*Monmouth* v. *State,* 54 Tex. Cr. 407 [114 S. W. 114]; *Pearl* v. *State,* 43 Tex. Cr. 189 [63 S. W. 1013]; *State* v. *Grba,* 196 Iowa, 241 [194 N. W. 250]; *Higgins* v. *Commonwealth,* 142 Ky. 647 [134 S. W. 1135].)

[15] The instruction which was given in this case, limiting the jury to a verdict finding the accused guilty of the highest offense or not guilty of any crime whatever, was fully warranted by the facts disclosed by the evidence. The blows which caused the death were inflicted with a heavy, blunt instrument which, under the circumstances of its use, may well have been found to be a deadly weapon. There was, as we have said, nothing to show a struggle or a combat. On the contrary, the evidence shows that if the killing was done by defendant the deceased was put to death in furtherance of a base, mercenary motive. Under these circumstances we have no hesitancy in saying that if defendant was guilty of anything he was guilty of brutal

and ruthless murder, done wilfully, deliberately, and with premeditation. If there was a failure of proof as to any element necessary to the establishment of murder in the first degree, there was a like failure of proof as to any lesser grade of homicide. Either appellant is guilty of murder in the first degree or he is entirely innocent.

Moreover, even if the giving of the instruction were error, it could not have harmed appellant. As we have stated, the jurors, who were fully instructed as to the ingredients of the crime of murder in the first degree, were told in effect that if they were not satisfied that defendant was guilty of that offense they must acquit him altogether. It will be presumed that they heeded this instruction and performed their whole duty in accordance with it. If they were not satisfied beyond a reasonable doubt that appellant was guilty of first degree murder, under the instructions they would have acquitted him. The instruction, therefore, would not have justified a reversal even if it had been error to give it. (*People* v. *Lopez*, 135 Cal. 25 [66 Pac. 965].)

[16] There is no merit in the claim that the trial court erroneously instructed upon the weight of circumstantial evidence. The trial judge gave several long instructions dealing with the subject of circumstantial evidence. In one of them the jury was advised that no conviction could be had unless the People established beyond a reasonable doubt that the death of Hey was caused by homicidal means; by another the jury was told that a conviction could not be had unless the prosecution established beyond a reasonable doubt that the injuries causing the death were inflicted in San Bernardino County; and in still another instruction the court charged the jury that a verdict of guilty could not be returned unless the People had established beyond a reasonable doubt that the defendant is the person who committed the murder, if murder there was. In the course of these instructions the trial court told the jury, in substance and in effect, that though these ultimate facts—death by homicidal means, the infliction of the lethal injuries in San Bernardino County and the identity of the defendant as the slayer—must be proved beyond a reasonable doubt, still they need not be shown by direct evidence but "may be established as satisfactorily and as conclusively by circumstantial as by direct evidence." This language did not

carry an intimation to the jury that the court deemed that the evidence satisfactorily or conclusively established or tended to establish any of the issues in the case. The court's statement that the facts referred to in the instructions might be established "as satisfactorily and as conclusively by circumstantial as by direct evidence," when read in connection with the whole charge, amounted to no more than a statement that circumstantial evidence is legal and competent, and that if the jurors found it to be sufficient to prove defendant's guilt beyond a reasonable doubt they might accept it and act upon it just as if it were direct evidence. So construed, the instructions state the law correctly. (*People* v. *Tom Woo,* 181 Cal. 331 [184 Pac. 389].)

No prejudicial error was committed in giving the instruction upon circumstantial evidence which substantially conforms with the one that was approved in *People* v. *Morrow,* 60 Cal. 142, and *People* v. *Urquidas,* 96 Cal. 239 [31 Pac. 52]. The only portion of the instruction of which there can be any just criticism is the following: "There is nothing in the nature of circumstantial evidence that renders it any less reliable than any other class of evidence." This language is more in the nature of an argument than a declaration of law, and it were better had it been omitted; but it is not prejudicially erroneous. (*People* v. *Wilder,* 134 Cal. 182 [66 Pac. 228]; *People* v. *Howard,* 135 Cal. 266 [67 Pac. 148]; *People* v. *Ung Sing,* 171 Cal. 83 [151 Pac. 1145].)

[17] The instruction upon the subject of "flight" was not harmful error. In substance it is such an instruction as was criticised in *People* v. *Jones, supra.* It failed to admonish the jury that the defendant must know that a crime has been perpetrated and that he is accused of its commission. This instruction, though frequently frowned upon by this court, never has been held to be ground for reversal, save in those cases where it appears that the defendant has been prejudiced by it. (*People* v. *Sainz,* 162 Cal. 242 [121 Pac. 922]; *People* v. *Lee Nam Chin,* 166 Cal. 570 [137 Pac. 917]; *People* v. *Erno, supra.*) No substantial injury appears here. In finding appellant guilty the jury necessarily must have found that the crime had been committed. And no other inference can reasonably be drawn from the evidence than that appellant knew that

the crime had been perpetrated and that he would be charged with its commission. This being the case, we hold, for the reasons given in *People* v. *Erno, supra,* that the instruction was not prejudicially erroneous, although we again take occasion to say that it should never be given.

There is no merit in the claim that the instructions assume the existence of certain incriminating circumstances. To support their contention in this regard, counsel have selected from the instructions on circumstantial evidence four or five detached passages. In the course of the instructions which charged the jury that it was incumbent upon the prosecution to establish, beyond a reasonable doubt that the body was that of Wilfred Hey, that the death was caused by homicidal means, that the injuries causing the death were inflicted in San Bernardino County and that defendant is the person who murdered Hey, the trial court, after saying that each of these facts could be established by circumstantial evidence, told the jury, in substance and effect, that these major facts might be established by certain circumstances which the instructions specifically mentioned, *if* the circumstances so referred to by the court were established to the satisfaction of the jury beyond a reasonable doubt, and *if* the jurors were satisfied from such circumstances, to a moral certainty and beyond a reasonable doubt, of the existence of such ultimate facts of identity, death by homicidal means, etc. This, in substance, is the purport of the instructions when the charge is considered as a whole, It is clear, therefore, that the instructions, when so considered, do not assume the existence of any of the circumstances mentioned in them.

[18] The court did not charge the jurors that they could take into consideration only such probative facts as were established beyond a reasonable doubt. In the course of the instructions to the effect that the identity of the dead body, death by homicidal means, etc., could be established by circumstantial evidence, the court advised the jurors that if they believed the specifically enumerated circumstances had been established beyond a reasonable doubt they could consider them "together with *all other facts and circumstances, if any, shown by the evidence beyond a reasonable doubt.*" In criticism of the italicized part of this instruction, appellant says that, while it is necessary that the essential elements of the crime shall be established be-

yond a reasonable doubt, "it has never been the rule that only probative facts which are so established shall be considered by the jury." We find no merit in the point. The instructions, when considered in the light of the charge as a whole, could not have left the jury with the impression that in determining defendant's guilt or innocence they could take into consideration only such probative facts as were established to their satisfaction beyond a reasonable doubt. In its instruction upon reasonable doubt the court was at pains to tell the jury that such a doubt "is that state of the case which, after an entire comparison and consideration of *all* the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." In the instructions which are made the object of appellant's present attack, the trial judge was dealing with the subject of circumstantial evidence, which he correctly defined as "proof by testimony of a chain of circumstances pointing sufficiently strong to the commission of the crime by the defendant to warrant a conviction." In substance and effect, the instructions under attack simply told the jurors that it was for them to decide whether any particular circumstance, concerning which testimony had been given, was necessary to complete a chain of circumstances establishing to their satisfaction, beyond all reasonable doubt, the facts essential to guilt; and that, if they decided that such circumstance was a necessary link in such a chain, it must be proven beyond all reasonable doubt before they could act upon it. This is a correct declaration of the law. We know of no California case which states a different rule. It certainly is in accord with what is said in *People* v. *Phipps,* 39 Cal. 326, 333; *People* v. *Ah Chung,* 54 Cal. 398; *People* v. *Ah. Jake,* 91 Cal. 98 [27 Pac. 595]; and *People* v. *Smith,* 106 Cal. 73 [39 Pac. 40].

[19] There is no merit in the claim that the court charged the jury that a particular fact or group of facts afforded sufficient proof of identity of the deceased, cause of death, etc. The learned trial judge was careful to advise the jury that though the circumstances referred to in the instructions, if shown by the evidence beyond a reasonable doubt, might be taken into consideration, identification could be established only "if such evidence [i. e., the circumstances adverted to] is sufficient to convince the

jury to a moral certainty as to the identity of the dead body." Nowhere in his charge did the trial judge undertake to tell the jury what should be the effect of any of the circumstances or chains of circumstance referred to hypothetically in the instructions. On the contrary, the jurors were specifically told, in each instance, that it was for them to determine, from all the circumstances established beyond a reasonable doubt, whether the identity of the body, cause of death by homicidal means, venue, etc., were or were not established beyond a reasonable doubt.

[20] There is no basis for the claim that the trial court charged that defendant could be found guilty of murder in the first degree without including in the charge the essential elements of deliberation and premeditation. From the body of those instructions which advised the jury that the identity of the deceased and death by homicidal means could be established by circumstantial evidence, appellant has wrenched the following detached passages: " . . . if you believe beyond a reasonable doubt that Wilfred Hey was unlawfully killed *as alleged in the information,* and . . . that defendant killed and murdered the said Wilfred Hey, *as alleged in the information,* then you will find the defendant guilty"; and: "If the jury further believe . . . beyond a reasonable doubt that the defendant inflicted the wound or wounds, and thereby caused the death of Wilfred Hey, *as alleged in the information,* then you will find the defendant guilty"; also: " . . . if you believe . . . beyond a reasonable doubt that the dead body found was the body of Wilfred Hey, and that the defendant, at about the time and place alleged in the information, killed and *murdered* the said Hey, then you will find the defendant guilty as charged." It is claimed that because the jury was instructed that the defendant, if guilty at all, could only be found guilty of murder in the first degree, these instructions are erroneous for the reason that they fail to state that the killing must be preceded by and be the result of the concurrence of deliberation and premeditation. In the two excerpts first above quoted the jurors were advised that they should return a verdict of guilty if they believed that the defendant murdered Hey and caused his death "as alleged in the information." The information charges that defendant murdered Hey "wilfully . . . and with malice aforethought." [21] The words "malice afore-

thought'' are equivalent to an averment that the killing was committed with deliberation and premeditation. (*People* v. *Fowler,* 178 Cal. 661 [174 Pac. 892]; *Jolly* v. *Commonwealth,* 110 Ky. 190 [96 Am. St. Rep. 429, 61 S. W. 49].) When, therefore, the court told the jurors that they should find appellant guilty—which, under the charge, meant guilty of murder in the first degree—if they believed that he murdered Hey and caused his death *as alleged in the information,* it in effect told them that they should find him guilty if they believed, beyond a reasonable doubt, that he murdered Hey wilfully and with deliberation and premeditation. If appellant desired an instruction defining the words of the information, ''malice aforethought,'' he should have asked for it. From what we have said, it is clear that appellant was not prejudiced by either of the first two above-quoted excerpts from the court's instructions. Nor was he prejudiced by the third passage above quoted, even though it does omit the qualifying words ''as alleged in the information.'' Before the court gave the instruction from which this excerpt is taken, it had carefully charged the jurors that to constitute murder in the first degree the killing must be preceded by and be the result of a concurrence of will, deliberation, and premeditation on the part of the slayer. They also were told that, to justify a conviction, every element of the crime must be established by the prosecution beyond a reasonable doubt. When, therefore, the jurors were told that they should return a verdict of guilty—i. e., guilty of murder in the first degree —if they believed beyond a reasonable doubt that defendant ''murdered'' Hey, they necessarily must have understood, as men of common understanding, that the court was referring to murder in the first degree, and that they could not return a verdict of guilty of that crime unless they believed beyond a reasonable doubt that defendant murdered the slain man wilfully, deliberately and with premeditation. [22] All the instructions, read and considered together as one charge, without straining the language, show a fair, harmonious and correct statement of the law applicable to the facts of the case, and contain all the conditions and limitations which are omitted from the isolated excerpts selected by appellant for criticism. This has been held repeatedly to obviate such objections as are now made. (*People* v. *Doyell,* 48 Cal. 92; *People* v. *Dennis,*

39 Cal. 636; *People* v. *Nelson,* 56 Cal. 81; *People* v. *Gray,* 61 Cal. 182 [44 Am. Rep. 549]; *People* v. *Hurtado,* 63 Cal. 288; *People* v. *Tomlinson,* 66 Cal. 346 [5 Pac. 509]; *People* v. *Clark,* 84 Cal. 583 [24 Pac. 313].)

We have examined the record with care, and we find no error which would justify a reversal.

The judgment and the order denying a new trial are affirmed.

Waste, C. J., Shenk, J., Richards, J., Curtis, J., and Seawell, J., concurred.

Rehearing denied.